[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JULY 9, 2009
THOMAS K. KAHN
CLERK

_____

No. 08-11848

_____

D. C. Docket No. 06-00223-CV-T-26-MSS

ST. LUKE'S CATARACT AND LASER INSTITUTE, P.A.,

Plaintiff-Counter-
Defendant-Appellant
Cross-Appellee,

versus

JAMES C. SANDERSON,
individually,
JAMES C. SANDERSON, M.D., LLC,

Defendants-Counter-
Claimants-Appellees
Cross-Appellant,

MARK ERICKSON,

Defendant-Counter-
Claimant.

_____

Appeals from the United States District Court
for the Middle District of Florida
_____

(July 9, 2009)

Before CARNES, HULL and COX, Circuit Judges.

HULL, Circuit Judge:

This appeal arises out of an intellectual property dispute between Plaintiff

St. Luke's Cataract and Laser Institute, P.C. ("St. Luke's") and Defendants Dr.

James C. Sanderson and James C. Sanderson, M.D., LLC ("Dr. Sanderson")

regarding the ownership and use of two Internet domain names (laserspecialist.com

and lasereyelid.com) and an Internet website ("the LaserSpecialist.com website").[1]

The domain names and website were used to advertise and promote St. Luke's

cosmetic surgery services while Dr. Sanderson worked for St. Luke's.

St. Luke's complaint alleged that, after he resigned from St. Luke's, Dr.

Sanderson improperly used the domain names and website to advertise and

promote his solo practice, James C. Sanderson, M.D., LLC.[2]  After a three-week

trial, the jury found in favor of Dr. Sanderson on St. Luke's copyright infringement

[1]The parties refer to the domain names using all lower case letters and to the website using both capital and lower case letters.  Thus, we will use the same spelling here.

[2]St. Luke's also named former St. Luke's webmaster Mark Erickson as a defendant in its complaint.  At trial, St. Luke's dismissed its claims against Erickson.

2

claim, but found in favor of St. Luke's on its six other claims, which included

service mark infringement, cyberpiracy, and unfair competition. The jury awarded

St. Luke's a total of $150,000 in profits and actual, statutory, and punitive

damages, but the district court later reduced the jury's award to $98,000 after

concluding some damages were duplicative. The district court also awarded St.

Luke's $550,134.00 in attorney's fees and $37,307.49 in costs.[3]

On appeal, St. Luke's argues that the district court erred by: (1) denying its

motion for a new trial on its copyright infringement claim; (2) limiting the scope of

its copyright to the 2003 version of the LaserSpecialist.com website; (3) finding

that the damages awarded on its cyberpiracy and service mark infringement claims

were duplicative; and (4) failing to exclude the testimony of Dr. Sanderson's

expert witness Patricia Perzel. Dr. Sanderson cross-appeals and challenges: (1) the

district court's denial of his motion for judgment as a matter of law on St. Luke's

service mark infringement and unfair competition claims; (2) the sufficiency of the

evidence to support the award of profits, punitive damages, and attorney's fees to

St. Luke's; and (3) the number of attorney hours in the district court's attorney's

---

[3]Additionally, the district court determined that Dr. Sanderson was the prevailing party on St. Luke's copyright infringement claim and awarded him $318,224.35 in statutory attorney's fees and $30,490.14 in costs under 17 U.S.C. § 505. This district court order is the subject of a separate appeal between the same parties presently before this Court in Appeal No. 08-16030 and is not discussed in this opinion.

fees award. After review and oral argument, we vacate and remand as to the district court's determination of duplicative damages, but affirm as to all other issues raised in St. Luke's appeal and Dr. Sanderson's cross-appeal.

## I. TRIAL EVIDENCE

We begin by reciting the trial evidence. Because one of St. Luke's copyright registrations at issue came after its complaint was filed, we outline the facts in chronological order, placing the complaint in the context of the factual events.

### A. Website Launch during Dr. Sanderson's Employment with St. Luke's

St. Luke's is a privately owned eye care and ambulatory surgery center. In August 1993, Dr. Sanderson joined St. Luke's as a general ophthalmologist to perform eye care and cataract surgery. In 1994, Dr. Sanderson left St. Luke's to complete a fellowship in oculoplastic surgery of the face and eyes.

In January 1995, Dr. Sanderson rejoined St. Luke's as a full-time employee and started an oculoplastic surgery practice, which was called the St. Luke's Cosmetic Laser Center.[4] At the time, St. Luke's did not have any other doctors who performed cosmetic surgery. St. Luke's paid for the equipment and staff that

---

[4]Dr. Sanderson was the only doctor at St. Luke's who practiced in the St. Luke's Cosmetic Laser Center. St. Luke's registered the fictitious name "St. Luke's Cosmetic Laser Center" with the Florida Secretary of State and listed the owner of the name as St. Luke's Cataract and Laser Institute, not Dr. Sanderson. Dr. Sanderson signed and dated the registration form.

4

Dr. Sanderson needed to establish an oculoplastic surgery practice and advertised Dr. Sanderson as its resident specialist in oculoplastic surgery.[5] However, St. Luke's informed Dr. Sanderson that he would need to participate in advertising and promoting the practice as well.

In 1998, Dr. Sanderson worked with St. Luke's webmaster Mark Erickson to create an Internet website to promote Dr. Sanderson's oculoplastic surgery practice at St. Luke's. Erickson registered the domain names laserspecialist.com and lasereyelid.com to use for the website. Dr. Sanderson was listed as the registrant with a St. Luke's physical address. St. Luke's paid the domain name registration and Internet hosting fees while Dr. Sanderson worked at St. Luke's. Erickson regularly provided Dr. Sanderson with backup disks containing the content of the LaserSpecialist.com website.

St. Luke's LaserSpecialist.com website contained information about St. Luke's, Dr. Sanderson's education and training, the surgical procedures that Dr. Sanderson performed, before and after photographs of patients, surgical videos, and other information for prospective patients. St. Luke's employees took and

---

[5]At his deposition, Dr. Sanderson defined oculoplastics as "an abbreviation for ophthalmic plastic and reconstructive surgery, which is a field of ophthalmology that originally had to do with the practice of surgery on the eyebrows and the eyelids and the lower eyelids and the orbit tissues around the eye, the tearing system, down into the nose." Dr. Sanderson explained that oculoplastics had expanded over time to include facial plastic surgery and laser skin resurfacing.

edited some of these photographs and videos. Dr. Sanderson wrote the text for the website. Erickson wrote the computer code for the website. Dr. Sanderson and Erickson collaborated on the graphics and layout of the LaserSpecialist.com website. Erickson placed a copyright notice on each page of St. Luke's LaserSpecialist.com website that stated "Copyright © [Year] St. Luke's Cosmetic Laser Center, All Rights Reserved."

In approximately 2000, Erickson and Dr. Sanderson added to the website a stylized version of the "LaserSpecialist.com" name in a blue and gold color scheme with a "swoosh" design to the right of the name, as shown below.

This logo appeared on the upper left corner of each page of the LaserSpecialist.com website. The logo served as a common navigational tool that linked the user to St. Luke's home page when clicked.

The website originally was located at the lasereyelid.com domain name but later was moved to the laserspecialist.com domain name in 1998.[6] The

---

[6]The parties stipulated that Dr. Sanderson began working with Erickson to create the website in 1998, but they did not specify the precise date that the website was launched. But we do know that, in 1998, St. Luke's had a LaserSpecialist.com website.

lasereyelid.com domain name then was "parked" to the laserspecialist.com domain name so that any user visiting the lasereyelid.com domain name would be automatically redirected to St. Luke's LaserSpecialist.com website. St. Luke's LaserSpecialist.com website was linked to St. Luke's primary website. Other registered domain names used to promote St. Luke's specific practices were similarly linked to St. Luke's primary website.

Dr. Sanderson worked at St. Luke's for over eight years from 1995 to 2003. St. Luke's LaserSpecialist.com website and logo, as well as its two domain names, were part of St. Luke's oculoplastic surgery service for over five years from 1998 to 2003.

**B.     Dr. Sanderson Leaves St. Luke's, Opens Solo Practice, and Relaunches the LaserSpecialist.com Website**

In 2003, St. Luke's employees began to hear rumors that Dr. Sanderson was planning to leave St. Luke's to open his own oculoplastic surgery practice. St. Luke's was concerned because it was planning a major renovation and expansion of its facilities used by Dr. Sanderson. In May 2003, Dr. James Gills, St. Luke's founder, and Bradley Houser, St. Luke's administrator, met with Dr. Sanderson to discuss the renovation plans. They asked Dr. Sanderson about the rumors that he was planning to leave. Dr. Sanderson denied the rumors and did not inform them that he was making arrangements to open his own practice. By the time of their

May 2003 meeting, Dr. Sanderson already had incorporated James C. Sanderson M.D., LLC and had begun negotiating a lease for office space for his own practice.

Less than a month later, on June 13, 2003, Dr. Sanderson tendered his letter of resignation to St. Luke's. Dr. Sanderson's letter requested that St. Luke's pay him 50 percent of the accounts receivable for services rendered as of May 31, 2003. According to administrator Houser, St. Luke's accounts receivable was comprised primarily of claims from insured patients for whom St. Luke's generally received payment of only 40 to 50 percent of the amount owed. Houser told Dr. Sanderson that his request was "outlandish," but Dr. Sanderson demanded that St. Luke's agree that day to pay him the requested amount. Dr. Sanderson also requested that St. Luke's send letters to all of his patients and post notices in St. Luke's lobby announcing that he was leaving St. Luke's to start his own practice and providing his new contact information. St. Luke's denied Dr. Sanderson's requests.

Dr. Sanderson's June 13, 2003 resignation letter stated that he would work for two more weeks. However, he stopped working at St. Luke's on June 13, even though he had a surgery scheduled that day. St. Luke's immediately began searching for Dr. Sanderson's replacement but did not hire a new oculoplastic surgeon until nearly two years later.

8

## C.    Dr. Sanderson's Website Launch in October 2003

After Dr. Sanderson resigned from St. Luke's, he sought to transfer the administrative contact information for the domain names and website to his new solo practice. At Dr. Sanderson's request, the registrar of the domain names, Register.com, Inc., sent an email notice to St. Luke's webmaster Erickson stating that it had received a request to change the administrative contact information for the domain names from Erickson to Dr. Sanderson. Erickson approved this change by clicking on certain links in the email, which effectively gave Dr. Sanderson all control of the domain names. The registrar responded in an email to Erickson, "Thank you for contacting Register.com. The transfer of Registrant for the domain names laserspecialist.com and lasereyelid.com has been successfully completed. The new Registrant is: James Sanderson P.O. Box 167 Odessa, Fl 33556 US Phone 727-938-1247 Email: todo432000@yahoo.com."

Dr. Sanderson also changed Internet hosting companies and directed the domain names to a new Internet hosting company over which Dr. Sanderson had control. And the former Internet hosting company used by St. Luke's for its LaserSpecialist.com website deleted that website content 30 days after Dr. Sanderson made the change.[7]

---

[7]There is some testimony that St. Luke's website content stayed on St. Luke's servers. However, there is also evidence that, after Dr. Sanderson left, St. Luke's did not have a copy of

Dr. Sanderson used a backup copy of St. Luke's LaserSpecialist.com website content, which he obtained from Erickson while at St. Luke's, to create a website for his new practice. Dr. Sanderson hired Jeff Fultz to make changes to the content of the backup copy of the LaserSpecialist.com website so it could be relaunched. Fultz updated the contact information for Dr. Sanderson's practice and removed the references to St. Luke's. Fultz changed the watermark on the videos to display Dr. Sanderson's name and changed the copyright disclaimer to state that the website was copyrighted by Dr. Sanderson. The rest of the content of the backup copy of the LaserSpecialist.com website was left the same as it was when Dr. Sanderson worked at St. Luke's. Dr. Sanderson stored this revised content for the LaserSpecialist.com website on the server of the new Internet hosting company and redirected the domain names to that server.

In October 2003, Dr. Sanderson relaunched the LaserSpecialist.com website for his solo practice using the laserspecialist.com and lasereyelid.com domain names. In 2004, Dr. Sanderson made cosmetic changes to the color and layout and added the LaserSpecialist.com website to the business cards he used to advertise his solo practice. At trial, St. Luke's counsel asked Dr. Sanderson, "[D]id you contact anybody at St. Luke's after you left St. Luke's asking whether it would be

the website and had to obtain a copy from an Internet archive.

10

acceptable for you to have the laserspecialist.com domain name and the website transferred to you?" Dr. Sanderson responded, "I did not contact someone to ask for permission for my domain name and -- no."

Some time after Dr. Sanderson resigned, St. Luke's realized that Dr. Sanderson was using the domain names and the LaserSpecialist.com website content on his private practice website. Specifically, in the Spring of 2005, a St. Luke's employee advised administrator Houser that Dr. Sanderson was using the domain names and the LaserSpecialist.com website for his own practice and that St. Luke's main website was still linked to the LaserSpecialist.com website. St. Luke's administrator Houser explained, "When Dr. Sanderson left, we had no oculoplastics practice, so we were not marketing an oculoplastics practice and I had no occasion to go to the laserspecialist.com website, and apparently none of our staff had occasion to go to the laserspecialist website either." Although St. Luke's attempted to remove the links between the two websites, some links were not discovered until this litigation was pending. And it was over three years after Dr. Sanderson left and over two years after Dr. Sanderson launched his own website that St. Luke's applied to register a copyright in its own LaserSpecialist.com website. As explained below, St. Luke's first registered the 2003 version of its website in January 2006 and later registered the 2000 version of

11

its website in August 2006.

**D.    The First Copyright Registration**: **2003 Version of Website**

Specifically, in January 2006, St. Luke's submitted an application to the United States Copyright Office to register a copyright in the February 15, 2003 version of the LaserSpecialist.com website (the "First Application"). St. Luke's listed itself as the author and claimed that the website was a "work made for hire." The copyright registration form asks the applicant to "[b]riefly describe nature of material <u>created by this author</u> in which copyright is claimed." (Emphasis added). St. Luke's claimed the "[e]ntire web site."

The copyright registration form also has a section entitled "Derivative Work Or Compilation" that asks the applicant to "[i]dentify any preexisting work or works that this work is based on or incorporates." St. Luke's answered, "Previous version in which claimant, St. Luke's Cataract and Laser Institute, is owner and author." On the follow-up question asking the applicant to "[g]ive a brief, general statement of the material that has been added to this work and in which copyright is claimed," St. Luke's wrote only, "Editorial revisions."

According to St. Luke's, it chose to register the February 15, 2003 version of the LaserSpecialist.com website because it wanted to use the last version of the LaserSpecialist.com website that Dr. Sanderson edited before he resigned from St.

12

Luke's in June 2003. St. Luke's did not have a copy of the LaserSpecialist.com

website content because it already had been deleted from the Internet hosting

company that St. Luke's used and Erickson had given Dr. Sanderson the backup

disks. Therefore, St. Luke's used an Internet archive called the "Wayback

Machine" to obtain the copy of the LaserSpecialist.com website that it filed with its

copyright registration.[8]

St. Luke's administrator Houser testified that he was involved in the 2006

copyright registration process. Houser reviewed the information submitted in the

First Application because he "wanted to make sure that [what] we were saying was

accurate." Houser said St. Luke's claimed a copyright over the "[e]ntire website"

in the First Application because "[a]t the time, we thought that the entire website

was original material." Houser conceded, however, that several things on the

LaserSpecialist.com website were not original, such as stock photographs, Dr.

Sanderson's thesis paper, and maps and directions from the Internet website

mapquest.com. In fact, Houser, who was designated as St. Luke's corporate

representative at trial, did not know which photographs on St. Luke's

---

[8]A copyright registrant is required to deposit with the Copyright Office two complete copies of the best edition of a published work with a registration application. 17 U.S.C. § 408(b); see also Geoscan, Inc. v. Geotrace Techs., Inc., 226 F.3d 387, 393 (5th Cir. 2000) ("In order to obtain a valid copyright registration for a published work, the applicant must submit two complete copies of the work.").

13

LaserSpecialist.com website were stock photographs and which were original. Houser also did not know the scope of St. Luke's ownership claim in parts of the LaserSpecialist.com website, such as the introductory page that contained Dr. Sanderson's photograph and biography. Houser admitted that Dr. Sanderson and Erickson used literature from Botox to draft the Botox page on St. Luke's LaserSpecialist.com website and that St. Luke's was not claiming a copyright in the maps and directions from mapquest.com, even though St. Luke's copyright registration claimed ownership of the entire website.

Houser also conceded that several parts of the deposit copy, submitted with the First Application, did not match the date of publication listed on the application. For example, Houser testified that the page on Cymetra injections was dated December 6, 2003 by the Wayback Machine Internet archive and thus was not on St. Luke's LaserSpecialist.com website on February 15, 2003. Houser admitted that the Cymetra injections page was put on the LaserSpecialist.com website in December 2003, well after Dr. Sanderson left St. Luke's in June 2003. Houser described this as a "clerical mistake" in the First Application. Houser also testified that the dates on the pages obtained from the Wayback Machine Internet archive indicated that some of the pages submitted to the Copyright Office were dated from earlier than February 15, 2003. When asked about other parts of the

14

website, Houser explained, "I think what we claimed . . . was the layout of the page and the way that it was put together. I believe that constitutes -- again, I'm not a copyright expert, but I believe that constitutes something that you can claim with copyright."

On January 30, 2006, the Copyright Office registered St. Luke's copyright in the February 15, 2003 version of the LaserSpecialist.com website (the "First Registration").

**E.     St. Luke's Complaint and Motion for a Preliminary Injunction**

A few days later, on February 9, 2006, St. Luke's filed a complaint against Dr. Sanderson based on his conduct regarding the domain names and the LaserSpecialist.com website. St. Luke's alleged that Dr. Sanderson: (1) infringed St. Luke's copyright in the LaserSpecialist.com website, in violation of the Federal Copyright Act, 17 U.S.C. § 501(a); (2) removed the copyright protection information from the LaserSpecialist.com website, in violation of the federal Digital Millenium Copyright Act ("DMCA"), 17 U.S.C. § 1202(c); (3) infringed St. Luke's LaserSpecialist.com service mark, in violation of the Lanham Act, 15 U.S.C. § 1125(a);[9] (4) committed cyberpiracy by registering and using the two

---

[9]Section 1125(a) was enacted as part of the Trademark Act of 1946, § 43, 60 Stat. 441, which is also known as the Lanham Act. The Anticybersquatting Consumer Protection Act of 1999, Pub. L. No. 106-113, § 3002(a), 113 Stat. 1536, 1501A-545–546, amended the Lanham Act to include § 1125(d).

domain names, in violation of the Anticybersquatting Consumer Protection Act ("ACPA"), 15 U.S.C. § 1125(d); (5) misappropriated and converted St. Luke's two domain names under Florida common law; (6) violated the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"), in violation of Fla. Stat. § 501.201-213; and (7) participated in unfair competition under Florida common law.[10]

Dr. Sanderson answered and counterclaimed for a declaratory judgment that St. Luke's First Registration was invalid and unenforceable. Dr. Sanderson also took down his LaserSpecialist.com website after St. Luke's filed its complaint.

After filing its complaint, St. Luke's filed a motion seeking a preliminary injunction. St. Luke's requested that the district court (1) order Dr. Sanderson to return the domain names, website content, and code to St. Luke's and (2) enjoin Dr. Sanderson from using any of the copyrighted content from the website and from accessing St. Luke's computer systems in any way.

The district court granted in part and denied in part St. Luke's motion.[11] The district court allowed Dr. Sanderson to retain possession of the two domain names and use certain website content that St. Luke's stipulated was outside of its claimed

_____

[10]St. Luke's also brought claims of service mark dilution and injury to business reputation but voluntarily dismissed those claims before trial.

[11]The parties consented to have a magistrate judge conduct all proceedings in the district court, including the trial, entry of a final judgment, and all post-trial proceedings. Thus, all rulings in this case were by the magistrate judge pursuant to this consent.

16

copyright. The district court warned, however, that any such retention or use could be considered later in awarding damages if St. Luke's prevailed in the litigation. The district court directed Dr. Sanderson to delete from his website certain content that was identified by the parties as likely owned by St. Luke's.

**F.     The Second Copyright Registration**: **2000 Version of Website**

On August 30, 2006, seven months after filing its complaint, St. Luke's filed another application with the Copyright Office to register a copyright in the June 9, 2000 version of the LaserSpecialist.com website (the "Second Application"). St. Luke's Second Application again listed itself as the author and claimed that the website was a "work made for hire." St. Luke's Second Application, however, differed in several other respects from the First Application.

First, the second copyright registration form, as did the first registration form, asked the applicant to "[b]riefly describe [the] nature" of the material in which copyright is claimed. St. Luke's responded, "Text, compilation, photos & audiovisual excluding third-party photos, text, marks and illustrations," as opposed to its claim of the "[e]ntire website" in the First Application. Second, unlike the First Application, St. Luke's did not provide any response to questions 6A or B in the section titled "Derivative Work Or Compilation."

In response to the question, "Has registration for this work, or for an earlier

17

version of this work, already been made in the Copyright Office?" in the section titled "Previous Registration," St. Luke's answered, "No." Although the 2000 and 2003 versions of the website were substantially similar, St. Luke's did not mention its First Registration of the LaserSpecialist.com website.

On September 1, 2006, St. Luke's submitted to the Copyright Office a deposit copy of the June 9, 2000 version of the LaserSpecialist.com website that it obtained from Dr. Sanderson during discovery. In its transmittal letter to the Copyright Office, St. Luke's stated, "The sample submitted with the registration application is the best available copy of the copyrightable material and represents, at best estimation, over 90-95% of the copyrightable content as it was displayed on the date indicated in the application. We have been unable to locate an original copy after diligent search." On September 5, 2006, the Copyright Office registered St. Luke's copyright in the June 9, 2000 version of the LaserSpecialist.com website (the "Second Registration").

St. Luke's amended its complaint to include the Second Registration in its copyright infringement claim. Dr. Sanderson responded that the Second Registration, like the First Registration, was invalid.

At trial, Houser reviewed the February 15, 2003 and the June 9, 2000 versions of the LaserSpecialist.com website and stated that the two versions were

18

"substantially similar," except for changes in the prices. When asked by Dr. Sanderson's counsel, "So, it's true, isn't it, that St. Luke's has registered two copies of the same website that are fundamentally the same but said that . . . one is a February 15th, 2003 version and the other is a June 9th, 2000 version, correct?", Houser responded, "Yes."

## G.     Dr. Sanderson and Expert Witnesses

At trial, Dr. Sanderson testified that he owned the LaserSpecialist.com website and the two domain names because he created the website content and paid the registration fees for the domain names while at St. Luke's. However, several St. Luke's employees testified that, during Dr. Sanderson's employment, St. Luke's paid for the development of the LaserSpecialist.com website, the registration fees for the domain names, and the other fees associated with the website. Dr. Sanderson conceded that St. Luke's paid these bills but argued that St. Luke's charged these costs back to him as part of the overhead expenses deducted from his pay. Both parties presented conflicting evidence regarding St. Luke's system of charging for overhead costs and whether St. Luke's actually charged Dr. Sanderson for the costs of the registration fees and the website in the overhead charges.

Several experts testified about damages and attempted to quantify the value

of the domain names and the LaserSpecialist.com website. The evidence showed that revenues from Dr. Sanderson's practice at St. Luke's were flat in the two years preceding the original launch of the LaserSpecialist.com website (1997 and 1998). After the LaserSpecialist.com website was launched, the revenues from Dr. Sanderson's practice at St. Luke's increased by approximately 26 to 29 percent for the next two years (1999 and 2000). The evidence also showed that revenues from Dr. Sanderson's solo practice decreased substantially in 2006 after he took down the LaserSpecialist.com website that he launched in October 2003.

In defense, Dr. Sanderson presented survey data suggesting that not many of his patients at St. Luke's were referred to his oculoplastic surgery practice from the LaserSpecialist.com website. While at St. Luke's, Dr. Sanderson asked his patients how they were referred to his practice in a questionnaire given to them before their first appointment and in person during their visit. In 1999, only 11 of Dr. Sanderson's 937 patients said they were referred by the LaserSpecialist.com website.

During the charge conference, the parties discussed the issue of overlapping damages. St. Luke's argued that the jury should be instructed to consider each claim and should not be concerned with duplicative remedies. During its closing argument, St. Luke's advised the jury that the court would rectify any issue of

20

duplicative damages, as follows:

> Now, you'll notice some of these claims are similar and the relief
> we're seeking on some of these claims is similar, and the Court will –
> the Court will decide later, after you make whatever award you think
> is appropriate, to make sure that we don't get more than one recovery.
> We can't get more than one recovery. That will be taken care of by
> the Court after trial.

## H.    Jury Verdict

The jury returned a verdict in favor of St. Luke's on all of its claims except its copyright infringement claim. While the jury found that Dr. Sanderson infringed St. Luke's copyright in portions of the LaserSpecialist.com website, it also found that Dr. Sanderson proved that St. Luke's First and Second Registrations were invalid. Based on the jury's findings, the district court entered judgment for Dr. Sanderson on St. Luke's copyright infringement claim.[12]

The jury awarded St. Luke's damages on its other claims in the amount of: (1) $50,000 in actual damages and $13,000 in profits on its service mark infringement claim under the Lanham Act; (2) $20,000 in statutory damages on its federal DMCA claim; (3) $10,000 in statutory damages on its cyberpiracy claim under the federal ACPA; (4) no damages on its misappropriation and conversion

---

[12]The verdict form included separate lines for findings about whether the First and Second Registrations were invalid. The verdict form instructed the jury that if it found that the First and Second Registrations were invalid, then it should not answer the questions on damages from the copyright infringement and should move on to the next claim. This was consistent with the requirement that a plaintiff must have a valid certificate of copyright registration in order to bring a copyright infringement cause of action.

21

claim under Florida law; (5) $7,000 in actual damages on its FDUTPA claim under Florida law; and (6) $10,000 in actual damages and $40,000 in punitive damages on its unfair competition claim under Florida law.

## II. POST-VERDICT MOTIONS

We next outline the district court's post-verdict rulings on the four motions being challenged on appeal and cross-appeal.

### A. St. Luke's Motion for a New Trial

St. Luke's filed a written motion for a new trial on its copyright infringement claim, which the district court denied. The district court observed that there was evidence and testimony from which the jury could find that St. Luke's falsely represented in its initial application to the Copyright Office that it owned the entire LaserSpecialist.com website and its contents. The district court noted that the parties disputed St. Luke's knowledge of the lack of originality of much of the content on the website and that the jury apparently resolved that dispute in favor of Dr. Sanderson. The district court observed that the jury was instructed that it had to find that St. Luke's intentionally or purposefully concealed relevant information with the intent of misleading the Copyright Office. The district court noted that the jury heard the trial testimony and had the opportunity to review the trial exhibits, which consisted of the two registrations and the deposit

22

materials submitted to the Copyright Office "as well as exemplars demonstrating that many aspects of the applications were not original to Plaintiff and could not have been construed to be." The district court determined that the jury's determination that both of St. Luke's registrations were invalid was not against the great weight of the evidence.

## B.    Dr. Sanderson's Two Motions

Dr. Sanderson filed a written motion for judgment as a matter of law on all of St. Luke's claims and also orally moved to demand that St. Luke's elect among the remedies awarded by the jury. The district court denied Dr. Sanderson's motion for judgment as a matter of law but ordered St. Luke's to elect between the damages awards. Over St. Luke's objections, the district court found that (1) the $25,000 in actual damages on the federal service mark infringement claim overlapped with the actual damages on the state unfair competition claim and (2) the $10,000 in statutory damages on the federal ACPA-cyberpiracy claim overlapped with the $7,000 in actual damages on the state FDUTPA claim.[13] Given these rulings by the district court, St. Luke's elected to receive (1) the $25,000 in actual damages on the service mark infringement claim and (2) the

---

[13]The district court also rejected Dr. Sanderson's argument that the punitive damages award of $40,000 on the state unfair competition claim and the profits award of $13,000 on the federal service mark infringement claim were duplicative because the claims had different standards of proof.

23

$10,000 in statutory damages on the federal ACPA-cyberpiracy claim. On appeal, however, St. Luke's does not challenge these two findings.[14]

Rather, it challenges the district court's third finding that the $25,000 in actual damages on the federal service mark infringement claim were also duplicative of the $10,000 in statutory damages on the ACPA-cyberpiracy claim. In the end, the district court entered final judgment of $98,000 for St. Luke's, consisting of: (1) $25,000 in actual damages and $13,000 in profits on the federal service mark infringement claim; (2) $20,000 in statutory damages for the federal DMCA claim; and (3) $40,000 in punitive damages on the state unfair competition claim.[15] The district court did not enter judgment on the $10,000 in statutory damages on the federal ACPA-cyberpiracy claim because of its finding that they were duplicative.

---

[14]St. Luke's conceded that the $50,000 in actual damages awarded on the federal service mark infringement claim and the $10,000 in actual damages on the state unfair competition claim were duplicative. However, St. Luke's suggested that the damages awards on both claims could survive, in part, because it sought only $25,000 as damages for the loss of use of both domain names and thus the jury could have split its damage award between the federal and state claims. Nevertheless, St. Luke's noted that it elected to receive the actual damages awarded on the federal service mark infringement claim, which it conceded should be reduced from $50,000 to $25,000.

The district court rejected St. Luke's argument that the jury intended to split its damages award between the two claims because (1) at St. Luke's request, the district court declined to instruct the jury to adjust its damages award to avoid double recovery and (2) St. Luke's advised the jury that it should not adjust its award to avoid double recovery.

[15]The district court denied St. Luke's motion for reconsideration of its damages determination.

## C. St. Luke's Motion for Attorney's Fees

St. Luke's moved for attorney's fees and costs in connection with its service mark infringement and federal DMCA claims. St. Luke's stated that its attorney's fees totaled $1,645,895. St. Luke's requested that the district court award $1,152,126.50, which reflected a 30 percent reduction to account for the attorney work performed in connection with its copyright infringement claim.

The district court granted St. Luke's motion for attorney's fees. As to St. Luke's federal service mark infringement claim, the district court determined that this was an "exceptional case." The district court relied on the jury's finding on the state unfair competition claim, which was governed by the same standard as the service mark infringement claim, that St. Luke's had proven by clear and convincing evidence that Dr. Sanderson's actions were committed with malice or reckless indifference to St. Luke's rights. The district court also found that St. Luke's was a prevailing party on its federal DMCA claim.

As to the amount of attorney's fees, the district court reduced the hourly rates of St. Luke's out-of-town counsel to the rates charged by St. Luke's local counsel. The district court agreed with St. Luke's that its attorney hours should be reduced by 30 percent to exclude compensation for claims for which St. Luke's did not recover. The district court noted that St. Luke's copyright and service mark

infringement claims were the most significant claims and that a substantial part of the trial was dedicated to establishing the validity of St. Luke's copyright. The district court also determined that an attorney's fees award of $1.3 million would be excessive in light of the recovery initially sought by St. Luke's (over $2 million), the attorney's fees it requested, and St. Luke's ultimate recovery of a total of only $98,000. The district court thus reduced St. Luke's hours by an additional 30 percent, for a total reduction of 60 percent, and awarded it $550,134.00 in attorney's fees.

## III. DISCUSSION

On appeal, the parties present several challenges to the district court's trial and post-verdict rulings. St. Luke's argues that the district court erred in: (1) denying its motion for a new trial on the copyright infringement claim;[16] (2) limiting the scope of St. Luke's copyright over the 2003 version of the LaserSpecialist.com website; (3) finding that the jury's damages award on its federal ACPA-cyberpiracy claim was duplicative of the award on its service mark

---

[16]We review a district court's denial of a motion for a new trial for an abuse of discretion. Lambert v. Fulton County, 253 F.3d 588, 595 (11th Cir. 2001). "This level of deference is particularly appropriate where a new trial is denied and the jury's verdict is left undisturbed." Rosenfield v. Wellington Leisure Prods., Inc., 827 F.2d 1493, 1498 (11th Cir. 1987). "[N]ew trials should not be granted on evidentiary grounds unless, at a minimum, the verdict is against the great—not merely the greater—weight of the evidence." Lipphardt v. Durango Steakhouse of Brandon, Inc., 267 F.3d 1183, 1186 (11th Cir. 2001) (citation and internal quotation marks omitted).

infringement claim;[17] and (4) admitting the testimony of Dr. Sanderson's expert witness Patricia Perzel.[18]  In the cross-appeal, Dr. Sanderson argues that: (1) the district court erred in denying his motion for judgment as a matter of law on St. Luke's service mark infringement and unfair competition claims;[19] (2) the evidence was insufficient to support the award of profits on the service mark infringement claim, punitive damages on the state unfair competition claim, and attorney's fees on the service mark infringement and DMCA claims; and (3) the district court awarded an unreasonable number of hours to St. Luke's in its attorney's fees

---

[17]We review a district court's determination regarding duplicative damages for clear error.  See Meader By and Through Long v. United States, 881 F.2d 1056, 1060 (11th Cir. 1989) (reviewing district court's damages award of future medical expenses for clear error where the government argued that the award was "excessive and duplicative" (quotation marks omitted)); see also Morrison Knudsen Corp. v. Ground Improvement Techniques, Inc., 532 F.3d 1063, 1077 (10th Cir. 2008) ("Whether an award is duplicative is a question of fact, which we review for clear error."); Black v. Ryder/P.I.E. Nationwide, Inc., 15 F.3d 573, 580 (6th Cir. 1994) ("We conclude that the question whether damage awards are duplicative is one of fact, and we will therefore review the district court's determination for clear error.").

[18]We review a district court's rulings on the admissibility of expert testimony for an abuse of discretion.  See United States v. Frazier, 387 F.3d 1244, 1258 (11th Cir. 2004) (en banc).

[19]We review de novo a district court's denial of a motion for judgment as a matter of law. Goldsmith v. Bagby Elevator Co., Inc., 513 F.3d 1261, 1275 (11th Cir. 2008); Millennium Partners, L.P. v. Colmar Storage, LLC, 494 F.3d 1293, 1299-1300 (11th Cir. 2007).  "'In considering the sufficiency of the evidence that supports the jury's verdict, we review the evidence in the light most favorable to, and with all reasonable inferences in favor of, the nonmoving party.' If reasonable and fair-minded persons in the exercise of impartial judgment might reach different conclusions based on the evidence presented, the motion should be denied." Millennium Partners, L.P., 494 F.3d at 1299-1300 (quoting Montgomery v. Noga, 168 F.3d 1282, 1289 (11th Cir. 1999)) (internal quotation marks omitted).  "We will reverse only if the facts and inferences point overwhelmingly in favor of one party, such that reasonable people could not arrive at a contrary verdict." Goldsmith, 513 F.3d at 1275 (internal quotation marks omitted).

award.[20]

After oral argument and a thorough review of the record, we affirm the district court in all respects except for its determination regarding duplicative damages. Only three issues—the denial of St. Luke's motion for a new trial on the copyright infringement claim, the election among duplicative damages, and the denial of Dr. Sanderson's motion for judgment as a matter of law—warrant further discussion.

## A.    St. Luke's Motion for a New Trial on the Copyright Infringement Claim

Copyright protection attaches at the time of an author's creation of an original work susceptible to copyright under 17 U.S.C. § 102(a). However, an owner cannot bring a cause of action for copyright infringement until the owner has complied with the copyright registration procedures in 17 U.S.C. § 411(a), which include payment of fees and deposit of copies of the work. This Court has recognized that the consensus among federal courts, including this circuit, is that § 411(a)'s registration requirement is a jurisdictional prerequisite to a copyright infringement suit.[21] Stuart Weitzman, LLC v. Microcomputer Res., Inc., 542 F.3d

---

[20]We review an award of attorney's fees and costs for abuse of discretion. Gray ex rel. Alexander v. Bostic, __ F.3d __, No. 08-15152, 2009 WL 1636625, at *1 (11th Cir. June 12, 2009); Tire Kingdom, Inc. v. Morgan Tire & Auto, Inc., 253 F.3d 1332, 1335 (11th Cir. 2001); ACLU v. Barnes, 168 F.3d 423, 427 (11th Cir. 1999).

[21]The Supreme Court granted certiorari in a Second Circuit case, In re Literary Works in Electronic Databases Copyright Litigation, 509 F.3d 116 (2d Cir. 2007), to consider the

859, 863 (11th Cir. 2008).  A valid certificate of registration satisfies this jurisdictional requirement and is "prima facie evidence of the validity of the copyright and of the facts stated in the certificate" when the registration is filed within five years after the first publication of the work.  17 U.S.C. § 410(c).

A certificate of registration satisfies the registration requirement in § 411(a) "regardless of whether the certificate contains any inaccurate information, unless . . . (A) the inaccurate information was included on the application for copyright registration with knowledge that it was inaccurate; and (B) the inaccuracy of the information, if known, would have caused the Register of Copyrights to refuse registration."  Id. § 411(b)(1).  "[O]missions or misrepresentations in a copyright application can render the registration invalid" where there has been "intentional or purposeful concealment of relevant information."  Original Appalachian Artworks, Inc. v. Toy Loft, Inc., 684 F.2d 821, 828 (11th Cir. 1982).  Thus, there must be a showing of "scienter" in order to invalidate a copyright registration.  Id.  "In general, an error is immaterial if its discovery is not likely to have led the Copyright Office to refuse the application."  Data Gen. Corp. v. Grunman Sys. Support Corp., 36 F.3d 1147, 1161 (1st Cir. 1994).

---

question: "Does 17 U.S.C. § 411(a) restrict the subject matter jurisdiction of the federal courts over copyright infringement actions?"  Reed Elsevier, Inc. v. Muchnick, 129 S. Ct. 1523 (2009). Whether § 411(a) is a jurisdictional requirement or simply a precondition to suit does not affect this case.  Thus, we need not wait for the Supreme Court's decision.

St. Luke's argues that the district court abused its discretion in denying its motion for a new trial because the jury's finding that its First and Second Registrations were invalid was against the great weight of the evidence. We disagree because there was evidence from which the jury could have inferred that St. Luke's made intentional, material misrepresentations in the First and Second Applications and the deposit copies it submitted to the Copyright Office.

The testimony from Bradley Houser, St. Luke's administrator and representative at trial, revealed that St. Luke's made numerous misrepresentations about authorship and originality on its copyright registration applications. For example, on the First Application, St. Luke's stated that it claimed a copyright over the entire February 15, 2003 version of the LaserSpecialist.com website. However, Houser admitted that the February 15, 2003 version of the LaserSpecialist.com website contained numerous things that were not original, such as stock photographs, Dr. Sanderson's thesis paper, and maps and directions that were obtained from the website mapquest.com. In fact, Houser still did not know which photographs were stock and which were original when he testified. Despite the many items whose originality was questionable, and others that clearly were obtained from other Internet sources, Houser indicated that St. Luke's did not make any inquiry to determine the source of these questionable items. More importantly,

30

St. Luke's did not disclose in its First Application that it was unsure whether some of the information on the website was original or from third parties. Rather, St. Luke's represented that the "[e]ntire website" was created by St. Luke's.

The deposit copy submitted with the First Application revealed further misrepresentations. Houser admitted that the deposit copy contained a page on Cymetra injections that was added to the LaserSpecialist.com website after Dr. Sanderson resigned from St. Luke's and was not on the website on February 15, 2003. In addition, Houser acknowledged that the date on several pages of the deposit copy showed that they appeared on the LaserSpecialist.com website before February 15, 2003. Nevertheless, St. Luke's represented to the Copyright Office in its First Application that the date of the first publication of the work being registered was February 15, 2003. The date of the first publication is highly relevant because it affects whether the five-year presumption of validity applies.

The Second Application also contained material misrepresentations. For example, St. Luke's responded "No" to the question on the copyright registration form asking, "Has registration for this work, or for an earlier version of this work, already been made in the Copyright Office?" St. Luke's provided this answer even though 90 to 95 percent of the content on the June 9, 2000 version of the LaserSpecialist.com website was the same as the February 15, 2003 version

31

covered by the First Registration. At trial, defense counsel showed Houser both versions of the website, and Houser testified that they were "substantially similar." Defense counsel asked Houser, "So, it's true, isn't it, that St. Luke's has registered two copies of the same website that are fundamentally the same but said that they are—one is a February 15th, 2003 version and the other is a June 9th, 2000 version, correct?" Houser responded, "Yes." Even though St. Luke's acknowledges the overwhelming similarities between the June 9, 2000 and February 15, 2003 versions, it failed to advise the Copyright Office of the First Registration when asked if registration for "this work" already had been made. While there were some differences between the two registered versions of the LaserSpecialist.com website, the jury was free to decide as a question of fact whether these were fundamentally the same versions of the website and whether it was a material omission for St. Luke's not to disclose that it had registered substantially the same version of the website several months earlier.

St. Luke's characterizes these discrepancies as "clerical errors" and contends that there was no evidence that any misrepresentation or omission in the First and Second Applications or the deposit copies was intentional or purposeful. However, the jury could have inferred such intent from the evidence discussed above. As to the First Registration, the jury could have inferred that St. Luke's knew that there

32

were parts of the LaserSpecialist.com website that were not original and intentionally misrepresented to the Copyright Office in its First Application that it had a copyright to the entire February 15, 2003 version of the LaserSpecialist.com website.[22] Similarly, the jury could have inferred that St. Luke's intended to mislead the Copyright Office in its Second Application by failing to disclose that it had registered a version of the LaserSpecialist.com website only a few months earlier that was 90 to 95 percent similar in content. The jury heard the trial testimony and had copies of both registrations and deposit copies in its deliberation. It was within the province of the jury to conclude that Houser's characterization of the misrepresentations was not credible.

In light of this evidence, we cannot say that the district court abused its discretion in denying St. Luke's motion for a new trial.[23]

---

[22]While this point is not the focus of Dr. Sanderson's arguments, we also note that St. Luke's first answer in the section entitled "Derivative Work or Compilation" was not responsive and was misleading in that St. Luke's was not the "owner and author" of all of the content in the February 15, 2003 version of the LaserSpecialist.com website.

[23]In its reply brief, St. Luke's acknowledges that the issue of whether the district court improperly limited the scope of its copyright in the 2003 version of the LaserSpecialist.com website should be addressed only if we conclude that the district court erred in denying St. Luke's motion for a new trial. See Appellant's Reply Br. at 23 ("St. Luke's does not appeal this issue as grounds for a new trial. Rather, should this court reverse the District Court's Order denying St. Luke's Motion for New Trial, St. Luke's seeks an order reversing the District Court's order, allowing St. Luke's to argue to the jury that the scope of the copyright in the 2003 version of the website is broader than the limits set by the District Court's erroneous order . . . ."). Because we conclude that the district court did not err in denying St. Luke's motion for a new trial, we accordingly decline to address this issue.

## B. Duplicative Damages

St. Luke's also argues that the district court erred in determining that the jury's award of $10,000 in statutory damages on St. Luke's ACPA-cyberpiracy claim overlapped with the jury's award of actual compensatory damages on St. Luke's federal service mark infringement claim. The Supreme Court has instructed that "the courts can and should preclude double recovery by an individual." Gen. Tel. Co. v. EEOC, 446 U.S. 318, 333, 100 S. Ct. 1698, 1708 (1980). It is clear that "no duplicating recovery of damages for the same injury may be had." White v. United States, 507 F.2d 1101, 1103 (5th Cir. 1975);[24] see also Conway v. Icahn & Co., 16 F.3d 504, 511 (2d Cir. 1994) ("Where a plaintiff seeks recovery for the same damages under different legal theories, only a single recovery is allowed.").

Here, we conclude that the district court erred in determining that St. Luke's could not recover damages under both the ACPA and the Lanham Act for several reasons. First, the statutory text of the ACPA explicitly states that a cyberpiracy damages award is "in addition to" any other civil remedies otherwise available. 15 U.S.C. § 1125(d)(3). Specifically, § 1125(d)(3) states that "[t]he civil action established under [15 U.S.C. § 1125(d)(1)] . . . and any remedy available under . . .

---

[24]Fifth Circuit decisions rendered on or before September 30, 1981, are binding precedent on this court. See Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

such action, shall be in addition to any other civil action or remedy otherwise applicable." Id.; see also Sporty's Farm L.L.C. v. Sportsman's Mkt., Inc., 202 F.3d 489, 500 (2d Cir. 2000) (stating that a party might "be eligible for damages under the [Federal Trademark Dilution Act] since there is nothing in the ACPA that precludes, in cybersquatting cases, the award of damages under any pre-existing law" and citing 15 U.S.C. § 1125(d)(3)). Thus, Congress, by statute, has prescribed recovery under the ACPA even if it is duplicative of other damages awarded. And no party argues that this statutory provision is unconstitutional.

In any event, the damage awards for St. Luke's service mark infringement and ACPA-cyberpiracy claims are not duplicative because the statutory elements of the two claims are different and, as a result, the two damages awards served different purposes, i.e., compensation for St. Luke's injury versus a sanction to deter Dr. Sanderson's wrongful conduct. An ACPA-cyberpiracy claim, unlike a service mark infringement claim, requires a showing of a "bad faith intent to profit" from a protected domain name.[25] Compare 15 U.S.C. § 1125(d)(1)(A),[26]

---

[25]We note that Dr. Sanderson does not argue that a showing of bad faith is an element of a service mark infringement claim.

[26]Section 1125(d)(1)(A) provides:
(1)(A) A person shall be liable in a civil action by the owner of a mark, including a personal name which is protected as a mark under this section, if, without regard to the goods or services of the parties, that person
    (i) has a bad faith intent to profit from that mark, including a personal name which is protected as a mark under this section; and

with 15 U.S.C. § 1125(a).[27]  Indeed, the district court instructed the jury that it must find that Dr. Sanderson acted in bad faith and that the jury may award statutory damages of "not less than $1,000, and not more than $100,000, in your discretion against any Defendants you have found to have violated the ACPA that you find is necessary to penalize the Defendants and deter future violations of the

---

> (ii) registers, traffics in, or uses a domain name that—
> > (I) in the case of a mark that is distinctive at the time of registration of the domain name, is identical or confusingly similar to that mark;
> > (II) in the case of a famous mark that is famous at the time of registration of the domain name, is identical or confusingly similar to or dilutive of that mark; or
> > (III) is a trademark, word, or name protected by reason of section 706 of Title 18 or section 220506 of Title 36.

15 U.S.C. § 1125(d)(1)(A).  Section 1125(d)(1)(B) has a non-exhaustive list of nine factors that a court may consider in determining whether a person has the bad faith intent required under § 1125(d)(1)(A)(i).  Id. § 1125(d)(1)(B).

[27]Section 1125(a)(1) provides:
(1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—
> (A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or
> (B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,

shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.
15 U.S.C. § 1125(a)(1).

[ACPA] by them."[28] The statutory damages on St. Luke's ACPA-cyberpiracy claim thus served to sanction or punish Dr. Sanderson for his bad faith conduct in order to deter future violations of the ACPA by him.[29] In contrast, the actual damages on its service mark infringement claim compensated St. Luke's for its own injuries and losses.[30] Thus, St. Luke's was not compensated twice for the same injury because the ACPA-cyberpiracy statutory damages award was focused

---

[28]On appeal, Dr. Sanderson does not argue that the district court erred in instructing the jury that it may consider the need to penalize him and deter future violations of the ACPA in determining its statutory damages award.

[29]The statutory damages provision for a cyberpiracy claim states:
In a case involving a violation of section 1125(d)(1) of this title, the plaintiff may elect, at any time before final judgment is rendered by the trial court, to recover, instead of actual damages and profits, an award of statutory damages in the amount of not less than $1,000 and not more than $100,000 per domain name, as the court considers just.
15 U.S.C. § 1117(d) (emphasis added).

[30]The damages provision for a service mark infringement claim under 15 U.S.C. § 1125(a) provides:
When . . . a violation under section 1125(a) . . . shall have been established in any civil action arising under this chapter, the plaintiff shall be entitled . . . to recover (1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action. The court shall assess such profits and damages or cause the same to be assessed under its direction. In assessing profits the plaintiff shall be required to prove defendant's sales only; defendant must prove all elements of cost or deduction claimed. In assessing damages the court may enter judgment, according to the circumstances of the case, for any sum above the amount found as actual damages, not exceeding three times such amount. If the court shall find that the amount of the recovery based on profits is either inadequate or excessive the court may in its discretion enter judgment for such sum as the court shall find to be just, according to the circumstances of the case. Such sum in either of the above circumstances shall constitute compensation and not a penalty. The court in exceptional cases may award reasonable attorney fees to the prevailing party.
15 U.S.C. § 1117(a).

37

on punishing Dr. Sanderson for his conduct, not compensating St. Luke's for its injury.

We base this deterrence-damages distinction not merely on the particular jury charge given in this case but on the similarity between the ACPA's statutory damages provision and the statutory damages provision in copyright law, which has been construed to deter and to sanction wrongful conduct. More specifically, the statutory damages provision in the ACPA, 15 U.S.C. § 1117(d), is similar to the statutory damages provision in copyright law, 17 U.S.C. § 504(c)(1)-(2),[31] in that it allows a plaintiff to elect to receive statutory damages within a prescribed range instead of actual damages and profits. See E. & J. Gallo Winery v. Spider Webs Ltd., 286 F.3d 270, 278 (5th Cir. 2002) ("The statutory damages provisions in the ACPA, which is relatively new, are akin to the statutory damages provisions of the copyright laws."). In the copyright context, we have recognized that "[g]enerally, statutory damages are awarded when no actual damages are proven,

_____

[31]Section 504(c)(1) and (2) provide that:
(1) Except as provided by clause (2) of this subsection, the copyright owner may elect, at any time before final judgment is rendered, to recover, instead of actual damages and profits, an award of statutory damages for all infringements involved in the action, with respect to any one work, for which any one infringer is liable individually, or for which any two or more infringers are liable jointly and severally, in a sum of not less than $750 or more than $30,000 as the court considers just. . . .
(2) In a case where the copyright owner sustains the burden of proving, and the court finds, that infringement was committed willfully, the court in its discretion may increase the award of statutory damages to a sum of not more than $150,000.
17 U.S.C. § 504(c)(1)-(2).

or actual damages and profits are difficult or impossible to calculate."

Cable/Home Commc'n Corp. v. Network Prods., Inc., 902 F.2d 829, 850 (11th Cir. 1990).  But we have also stressed that "when the infringement is willful, deterrence of future violations is a legitimate consideration because defendants must not be able to sneer in the face of copyright owners and copyright laws."  Id. at 851 (internal quotation marks omitted) (citing, inter alia, F.W. Woolworth Co. v. Contemporary Arts, Inc., 344 U.S. 228, 233, 73 S. Ct. 222, 225 (1952)).  Likewise, in the copyright context, the Supreme Court has explained that deterrence is a proper consideration in a statutory damages award in order to achieve the statute's goals, as follows:

> [A] rule of liability which merely takes away the profits from an infringement would offer little discouragement to infringers.  It would fall short of an effective sanction for enforcement of the copyright policy.  The statutory rule, formulated after long experience, not merely compels restitution of profit and reparation for injury but also is designed to discourage wrongful conduct.  The discretion of the court is wide enough to permit a resort to statutory damages for such purposes.  Even for uninjurious and unprofitable invasions of copyright the court may, if it deems it just, impose a liability within statutory limits to sanction and vindicate the statutory policy.

F.W. Woolworth Co., 344 U.S. at 233, 73 S. Ct. at 225.  This Court similarly has stated that a district court, in awarding statutory damages in a copyright infringement action, "may take into account the attitude and conduct of the parties" and "should consider both the willfulness of the defendant's conduct and the

39

deterrent value of the sanction imposed." Cable/Home Commc'n Corp., 902 F.2d

at 852 (quotation marks omitted).

In light of the similarities in the language of these two statutory provisions

and Congress's intent to deter cyberpiracy,[32] other circuits have interpreted the

ACPA's statutory damages provision to contain a deterrence element similar to

copyright law. See, e.g., E. & J. Gallo Winery, 286 F.3d at 278 (noting that the

copyright statutory damages provision "'is designed to discourage wrongful

conduct'" and affirming statutory damages award of $25,000 under the ACPA,

even though plaintiff did not suffer any actual injury (quoting F.W. Woolworth

Co., 344 U.S. at 233, 73 S. Ct. at 225)). We agree and conclude that an ACPA

statutory damages award, which serves as a sanction to deter wrongful conduct, is

not duplicative of a service mark infringement actual damages award, which serves

to compensate a plaintiff for his injuries.

Based on all of these reasons, we vacate the district court's judgment and

remand with instructions for the district court to reinstate the jury's award of

$10,000 in statutory damages in favor of St. Luke's on its ACPA-cyberpiracy

---

[32]In drafting the ACPA, Congress stated that "legislation is needed to clarify the rights of trademark owners with respect to bad faith, abusive domain name registration practices, to provide clear deterrence to prevent bad faith and abusive conduct, and to provide adequate remedies for trademark owners in those cases where it does occur." S. Rep. 106-140, at 7-8 (1999) (emphasis added).

claim.[33]

## C.    Dr. Sanderson's Motion for Judgment as a Matter of Law

In his cross-appeal, Dr. Sanderson contends that the district court erred in denying his motion for judgment as a matter of law on St. Luke's federal service mark infringement claim and its state unfair competition claim. Both claims required St. Luke's to prove that (1) its service mark was entitled to protection and (2) Dr. Sanderson used a similar or identical mark that was likely to confuse consumers. Welding Servs., Inc. v. Foreman, 509 F.3d 1351, 1356 (11th Cir. 2007). A service mark is defined as "any word, name, symbol, or device, or any combination thereof . . . used by a person . . . to identify and distinguish the services of one person, including a unique service, from the services of others and to indicate the source of the services, even if that source is unknown."[34] 15 U.S.C. § 1127. Viewing the evidence in the light most favorable to, and drawing all reasonable inferences in favor of, the jury's verdict, we conclude that the district court did not err in its rulings.

First, St. Luke's presented sufficient evidence to support the jury's finding

_____

[33]Because we reach this conclusion, we need not address St. Luke's argument that the jury may have split its damages award between these claims.

[34]Because St. Luke's, through its former employee Dr. Sanderson, provided a service rather than goods, LaserSpecialist.com is a service mark. See Leigh v. Warner Bros., Inc., 212 F.3d 1210, 1217 n.5 (11th Cir. 2000) ("Whereas trademarks identify the source of goods for sale, service marks identify the provider of services.").

41

that its "LaserSpecialist.com" name was a service mark entitled to protection under § 1127. St. Luke's used the LaserSpecialist.com name on each page of the LaserSpecialist.com website. St. Luke's focused the web-user's attention on that name by highlighting the name with blue and yellow lettering and a "swoosh." Several witnesses described this stylized version of the LaserSpecialist.com name as the LaserSpecialist.com "logo." Moreover, this LaserSpecialist.com logo was strategically placed in the upper left corner of each page. St. Luke's presented testimony from expert witness John Pellman, a marketing professional who had been involved in the design of over 400 websites for cosmetic surgeons, that commercial websites, including those for cosmetic surgery practices, generally are branded and that brands typically are placed in the upper left corner. Pellman explained:

> English, and most languages, are read from top to bottom, left to right. So, the eye of a visitor to a website is immediately drawn to the upper left-hand corner. It becomes a placement mark of where you know where you are, 'cause you can have multiple web browsers opened to different websites at the same time. So, when you go back to that particular browser and you look in the upper left-hand corner, you'll find the name often of the company or the website that you're looking at.

This same LaserSpecialist.com name, in a stylized version, also served as a "hot spot" that linked users to the home page of the LaserSpecialist.com website. In addition to the branding on the LaserSpecialist.com website, St. Luke's used the

42

LaserSpecialist.com name in numerous advertisements to market the services of the St. Luke's Cosmetic Laser Center and St. Luke's employee Dr. Sanderson. Based on this evidence, the jury reasonably could have concluded that the LaserSpecialist.com name was used to identify St. Luke's as a source of oculoplastic surgery.

And St. Luke's presented sufficient evidence for the jury to conclude that St. Luke's LaserSpecialist.com mark was entitled to protection. Service mark protection is only available to marks that are distinctive, i.e., "marks that serve the purpose of identifying the source of the goods or services." Welding Servs., Inc., 509 F.3d at 1357. The four categories of distinctiveness in service mark law, listed in descending order of strength, are (1) fanciful or arbitrary, (2) suggestive, (3) descriptive, and (4) generic. Id. This Court has noted that "[t]he demarcation between each category is more blurred than it is definite." Coach House Rest., Inc. v. Coach and Six Rests., Inc., 934 F.2d 1551, 1559 (11th Cir. 1991). "Distinctiveness is a question of fact, whether the question is inherent distinctiveness or acquired distinctiveness." Welding Servs., Inc., 509 F.3d at 1357.

Although the jury did not make a specific finding regarding the category of distinctiveness in which St. Luke's LaserSpecialist.com mark falls, the evidence

43

was sufficient to find that the mark was, at a minimum, suggestive. A suggestive mark "refers to some characteristic of the goods, but requires a leap of the imagination to get from the mark to the product." Id. at 1357-58. "Because a suggestive service mark is inherently distinctive, no proof of secondary meaning is required for it to be protectable." Coach House Rest., Inc., 934 F.2d at 1560.

St. Luke's presented testimony from Pellman that he had never heard of a cosmetic surgeon identified as a "laser specialist" or ever referred to a cosmetic surgeon as a "laser specialist" on any of the websites he had designed. Pellman commented that the term "laser specialist" could refer to a Lasik surgeon or a dermatologist. In addition, St. Luke's administrator Houser testified that he had never heard of an oculoplastic surgeon referred to as a "laser specialist." The jury reasonably could have concluded from this evidence that the LaserSpecialist.com mark was suggestive because it does not immediately convey the nature of the services offered and requires a leap of the imagination to deduce that a "laser specialist" is a oculoplastic surgeon. Thus, the jury could have determined that the LaserSpecialist.com mark was inherently distinctive and protected based on this evidence alone.

Even if the jury did not find that the LaserSpecialist.com mark was suggestive, the evidence was sufficient for the jury to find that it was a protected,

44

descriptive mark. A descriptive mark "identifies a characteristic or quality of the service or product." <u>Welding Servs., Inc.</u>, 509 F.3d at 1358. Pellman testified that a domain name can affect the amount of traffic a website receives and is particularly effective if it is easy to remember or describes a particular product or company. In explaining why he believed that LaserSpecialist.com was an effective domain name for a cosmetic surgery practice, Pellman stated that "the search terms that people might type into Google or Yahoo would often include those two words, perhaps among a few other words that they enter in, but it's -- if it's a cosmetic surgery practice and they're working with lasers for surgery or for micro -- or for skin conditions, then it's synonymous with that type of practice." This evidence was sufficient to support a finding that the LaserSpecialist.com mark described a characteristic of the services performed with a laser by Dr. Sanderson at the St. Luke's Cosmetic Laser Center, such as eyelid surgery and hair removal.

If the jury found that the LaserSpecialist.com mark was descriptive, it also had to find that the mark had acquired secondary meaning in order for it to be protected. <u>See</u> <u>Coach House Rest., Inc.</u>, 934 F.2d at 1560 ("If a court finds that the term is descriptive, and hence not inherently distinctive, petitioner must establish that a secondary meaning attached before registrant began using the logo in order to obtain trade identity rights."). "A name has acquired secondary meaning when

45

the primary significance of the term in the minds of the [consuming] public is not the product but the producer." Welding Servs., Inc., 509 F.3d at 1358 (quoting Am. Television & Commc'ns Corp. v. Am. Commc'ns & Television, Inc., 810 F.2d 1546, 1549 (11th Cir. 1987)) (internal quotation marks omitted) (alteration in original). The determination of whether a mark has acquired secondary meaning depends on "the length and nature of the name's use, the nature and extent of advertising and promotion of the name, the efforts of the proprietor to promote a conscious connection between the name and the business, and the degree of actual recognition by the public that the name designates the proprietor's product or service." Id. The existence of a secondary meaning is a question of fact. Coach House Rest., Inc., 934 F.2d at 1560.

The evidence was also sufficient for the jury to find that the LaserSpecialist.com mark had acquired secondary meaning. For nearly five years before Dr. Sanderson resigned, St. Luke's used the LaserSpecialist.com name to advertise and promote Dr. Sanderson in the St. Luke's Cosmetic Laser Center. The stylized LaserSpecialist.com "logo" appeared on every page of the LaserSpecialist.com website for the latter three years of that five-year time period. St. Luke's listed the LaserSpecialist.com website on numerous marketing materials for Dr. Sanderson's practice at St. Luke's, including billboards, fliers, brochures,

46

and newspaper advertisements.

In addition, Jennifer Corrow, Dr. Sanderson's former cosmetic surgery assistant at St. Luke's, testified that Dr. Sanderson told her to refer his cosmetic surgery patients to the LaserSpecialist.com website. When patients called in, Corrow would refer to the website. Corrow testified that a lot of the patients would say that they already had checked out the website. In fact, there was evidence that the website received significant traffic while Dr. Sanderson was at St. Luke's. The jury could have inferred that the LaserSpecialist.com name acquired a secondary meaning of association with St. Luke's in the mind of the public based on the evidence of the length and nature of the use of the LaserSpecialist.com mark by St. Luke's to promote Dr. Sanderson's practice. Thus, the evidence was sufficient for the jury to find that LaserSpecialist.com was protected either as a suggestive or descriptive mark.

Finally, St. Luke's presented sufficient evidence for the jury to find a likelihood of confusion between St. Luke's LaserSpecialist.com mark and the identical name used by Dr. Sanderson. The likelihood of confusion is assessed by examining seven factors: "(1) distinctiveness of the mark alleged to have been infringed; (2) similarity of the infringed and infringing marks; (3) similarity between the goods or services offered under the two marks; (4) similarity of the

47

actual sales methods used by the two parties, such as their sales outlets and customer base; (5) similarity of advertising methods; (6) intent of the alleged infringer to misappropriate the proprietor's good will; and (7) existence and extent of actual confusion in the consuming public." Welding Servs., Inc., 509 F.3d at 1360.

Here, the likelihood of confusion was clear. This is not a case where one party used a mark that is arguably similar to a mark owned by another party. Dr. Sanderson used the same LaserSpecialist.com name, the same website, and the same logo in the same manner, in basically the same format, for the same geographical market to target the same customers for the same services previously provided at St. Luke's. Dr. Sanderson merely removed the references to St. Luke's, changed the contact information, and relaunched the LaserSpecialist.com website for his own promotion. These facts were more than sufficient for the jury to find that there was a likelihood of confusion in the public between St. Luke's protected mark and the name used by Dr. Sanderson.

For all these reasons, we conclude that there was sufficient evidence to support the jury's verdict in favor of St. Luke's on its service mark infringement claim and that the district court thus did not err in denying Dr. Sanderson's motion

for judgment as a matter of law.[35]

## IV. CONCLUSION

In sum, we reverse the district court's judgment and remand with instructions for the district court to reinstate the jury's award of $10,000 in statutory damages in favor of St. Luke's on its cyberpiracy claim. We affirm the district court as to all other claims raised in St. Luke's appeal and Dr. Sanderson's cross-appeal.

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED WITH INSTRUCTIONS.**

---

[35]In his cross-appeal, Dr. Sanderson also claims that the evidence was insufficient to support St. Luke's claim for profits and punitive damages. However, Dr. Sanderson failed to raise this claim in his Federal Rule of Civil Procedure 50(a) motion for partial judgment as a matter of law at the close of St. Luke's case. Although Dr. Sanderson challenged the sufficiency of the evidence to support these damages in his Federal Rule of Civil Procedure 50(b) motion for judgment as a matter of law filed after the jury's verdict, this Court has stated, "A Rule 50(b) motion is a renewal of a Rule 50(a) motion. This Court repeatedly has made clear that any renewal of a motion for judgment as a matter of law under Rule 50(b) must be based upon the same grounds as the original request for judgment as a matter of law made under Rule 50(a) at the close of the evidence and prior to the case being submitted to the jury." Doe v. Celebrity Cruises, Inc., 394 F.3d 891, 903 (11th Cir. 2004) (citation omitted). "If a party asserts new grounds in its renewed motion for judgment as a matter of law that it did not assert in its initial motion for judgment as a matter of law, a court 'may not rely on the new grounds to set aside the jury's verdict.'" Shannon v. Bellsouth Telecomms., Inc., 292 F.3d 712, 717 n.3 (11th Cir. 2002) (quoting Ross v. Rhodes Furniture, Inc., 146 F.3d 1286, 1289 (11th Cir. 1998)). Accordingly, Dr. Sanderson's challenge to the sufficiency of the evidence to support these damages is not preserved for appeal and will not be addressed.