**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**April 30, 2021**

**Christopher M. Wolpert**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

_____

ERIK M. UNDERWOOD, a Colorado
resident, and MY24HOURNEWS.COM,
INC., a Colorado corporation,

     Plaintiffs - Appellants,

v.

BANK OF AMERICA CORPORATION, a
Delaware corporation,

     Defendant - Appellee.

No. 19-1349
No. 20-1087

_____

**Appeal from the United States District Court**
**For the District of Colorado**
**(D.C. No. 1:18-CV-02329-RM-MEH)**

_____

Marc A. Goldman, Massey & Gail, Washington, D.C., (Harold R. Bruno III, and
Nicholas F. Labor, Robinson Waters & O'Dorisio, P.C., Denver, Colorado, with him on
the briefs) for Plaintiffs – Appellants.

David H. Bernstein, (Jeremy Feigelson, Jared I. Kagan, and Alexandra P. Swain, with
him on the brief), Debevoise & Plimpton LLP, New York, New York, for Defendant –
Appellee.

_____

Before **MATHESON**, **EBEL**, and **MORITZ**, Circuit Judges.

_____

**MATHESON**, Circuit Judge.

_____

Erik Underwood and My24HourNews.Com, Inc., ("Mr. Underwood" or the "Plaintiffs"), own two putative service marks: "E.R.I.C.A." and "my24erica.com." Mr. Underwood claims to have used these marks in his business, which offers internet-based search engine and personal assistant services. Bank of America Corporation ("BofA") owns a registered federal trademark for a mobile banking application known as "ERICA."

Mr. Underwood sued BofA for infringing his marks. BofA counterclaimed to cancel Mr. Underwood's Georgia registration of his E.R.I.C.A. mark. The district court granted BofA's motions for summary judgment on its cancellation counterclaim and on Mr. Underwood's infringement claims. Exercising jurisdiction under 28 U.S.C. § 1291, we affirm in part and vacate and remand in part.

## I. BACKGROUND

### A. *Legal Background*

"The principle underlying trademark protection is that distinctive marks—words, names, symbols, and the like—can help distinguish a particular artisan's goods from those of others." *B&B Hardware, Inc. v. Hargis Indus., Inc.*, 575 U.S. 138, 142 (2015).[1] "The basic rule of trademark ownership in the United States is priority of use," which

---

[1] The marks at issue in this case are service marks. Service marks are used to identify services, while trademarks are used to identify goods. For the most part, "[s]ervice marks and trademarks are governed by identical standards." *See Chance v. Pac-Tel Teletrac Inc.*, 242 F.3d 1151, 1156 (9th Cir. 2001). And "the term 'trademark' is generally understood to include marks used in the marketing of either goods or services." Restatement (Third) of Unfair Competition § 9 cmt. f (Am. L. Inst. 1995).

2

occurs through "use of a symbol to identify the goods or services of one seller and distinguish them from those offered by others." 2 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 16:1 (5th ed. Mar. 2021 update) [hereinafter McCarthy].

"The foundation of current federal trademark law is the Lanham Act." *Matal v. Tam*, 137 S. Ct. 1744, 1752 (2017). "[T]he purpose of the Lanham Act was to codify and unify the common law of unfair competition and trademark protection." *Inwood Lab'ys, Inc. v. Ives Lab'ys, Inc.*, 456 U.S. 844, 861 n.2 (1982) (White, J., concurring). "Under the Lanham Act, trademarks that are used in commerce . . . may be federally registered." *Tam*, 137 S. Ct. at 1752 (quotation omitted). Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), "protects an unregistered mark." *See Centaur Commc'ns, Ltd. v. A/S/M Commc'ns, Inc.*, 830 F.2d 1217, 1220 (2d Cir. 1987), *overruled on other grounds by Paddington Corp. v. Attiki Imps. & Distribs., Inc.*, 996 F.2d 577, 585 (2d Cir. 1993). Federally unregistered marks also "can be enforced under state common law, or if it has been registered in a State, under that State's registration system." *Tam*, 137 S. Ct. at 1753. Federal and state trademark protections generally parallel each other, and the former do not preempt the latter. *See id.*

B. *Factual Background*

1. **Initial Development of E.R.I.C.A.**

In 2009, Mr. Underwood developed a business plan including a virtual assistant called E.R.I.C.A.—named for Mr. Underwood's sister and a backronym for Electronic Repetitious Informational Clone Application. Mr. Underwood envisioned E.R.I.C.A. as

3

an animated application "that you ask and you get information in return," and that would "mimic[] human interaction." App., Vol. 4 at 489.[2] Mr. Underwood explained that in 2009 E.R.I.C.A. was not "launched, but there was a demo associated with her" that appeared on his website, My24HourNews.Com. *Id.* at 489-90.

Mr. Underwood took steps in 2009 to attract investor interest in his business. He used a PowerPoint presentation at business pitch meetings containing the following picture of E.R.I.C.A. to show "the concept of how E.R.I.C.A. would look" and "what she might say while interacting with the viewer as a finished end-product":



App. (No. 19-1349), Vol. 2 at 314, 319, 321. Mr. Underwood gave a presentation at the Small Business Administration office in Atlanta. Between 2009 and 2011, he distributed nearly 1,500 business cards featuring a picture of E.R.I.C.A. Beginning in February 2010, he distributed roughly 200 DVDs containing the E.R.I.C.A. demo.

---

[2] Unless otherwise noted, citations are to the Appendix and the parties' briefs in case No. 20-1087.

## 2. **Georgia Registration**

In October 2010, Mr. Underwood applied to register a service mark in Georgia for "a multi national computer animated woman . . . [named] Erica." App. (No. 19-1349), Vol. 1 at 142. On the application, Mr. Underwood explained the service associated with the mark: "E.R.I.C.A. verbally tells the news and current events through cell phone and computer applications." *Id.* The mark was approved for registration in Georgia.

## 3. **Proposed Joint Venture**

In 2012, Mr. Underwood gave a presentation to AT&T. AT&T and My24HourNews.Com, Inc. discussed forming a joint venture, but it never came to fruition.[3]

## 4. **my24erica.com**

In 2012, Mr. Underwood registered the domain name my24erica.com with GoDaddy.com.[4] my24erica.com functioned "as a search engine . . . where [E.R.I.C.A.] can recall queries of movies [and] television shows." App., Vol. 3 at 517. A user could enter a title into the search bar on my24erica.com, and E.R.I.C.A. could "offer her picks of her favorite kind of movies through an algorithm code." *Id.* The same picture of the

---

[3] The failed joint venture has spawned multiple lawsuits. *See My24HourNews.Com, Inc. v. AT&T Corp.*, 791 F. App'x 788 (11th Cir. 2019) (unpublished); *My24HourNews.Com, Inc. v. AT&T Corp.*, No. 1:17-cv-06657-RA (S.D.N.Y. 2017); *My24HourNews.Com, Inc. v. AT&T Corp.*, No. 1:15-cv-012120-RM-NYW (D. Colo. 2015). None is relevant to this appeal.

[4] GoDaddy.com "is a domain name registrar and a web hosting provider." It is a "company that other companies and individuals rely on to register their Internet domain names, and to host their website on [the GoDaddy] servers." App., Vol. 2 at 301.

computer-generated human face that appeared on the PowerPoint presentation appeared in the top left corner of my24erica.com. my24erica.com also had a hyperlink to a Facebook page for My24HourNews.Com, which received 772 "likes" by September 2018.

According to Mr. Underwood, my24erica.com became publicly accessible in March 2015. *See* App., Vol. 5 at 1061. BofA claims that my24erica.com was not publicly accessible until June 2018. *See* Aplee. Br. at 40.

In support of his assertion, Mr. Underwood points to, among other things, declarations of individuals who claim to have visited my24erica.com in the relevant time frame. The parties also introduced dueling expert reports. BofA submitted the report of Keena Willis, the Director of Global Subpoena Compliance at GoDaddy.com, LLC, the hosting platform on which my24erica.com was allegedly hosted. She reviewed voluminous business records from GoDaddy.com and concluded the "records indicate that, on or about June 27, 2018, Mr. Underwood began hosting my24erica.com with GoDaddy." App., Vol. 2 at 302. Mr. Underwood, on the other hand, relied on the expert report of Jonathan Hochman, who investigated records associated with my24erica.com and my24erica.com's web hosting control panel, database administration tool, and administrator portal. He concluded the website was launched on March 18, 2015.

5. **BofA's Registered Mark**

In October 2016, BofA filed an "intent to use" application with the United States Patent and Trademark Office ("USPTO") for ERICA, a mark associated with "voice controlled information and personal assistant devices in the field of banking and personal

6

finance." App., Vol. 1 at 36. The USPTO registered the mark in July 2018. The mark had a priority date based on the October 2016 filing date. *See* 15 U.S.C. § 1057(c).

## C. *Procedural Background*

### 1. Complaint

Alleging that BofA's mark infringed his E.R.I.C.A. and my24erica.com marks, Mr. Underwood sued BofA for (1) false association under Section 43(a) of the Lanham Act, (2) common law service mark infringement, (3) common law unfair competition, (4) violations of the Colorado Consumer Protection Act, and (5) service mark infringement under Georgia law.

### 2. Counterclaims

BofA answered the complaint and brought six counterclaims: one for cancellation of the Georgia registration for the E.R.I.C.A. mark, and five for declarations under the federal Declaratory Judgment Act that BofA had not violated (1) Section 43(a) of the Lanham Act, (2) common law service mark protections, (3) common law unfair competition protections, (4) the Colorado Consumer Protection Act, and (5) Georgia service mark protections.

### 3. Motion for Partial Summary Judgment

BofA moved for partial summary judgment on its cancellation counterclaim. The district court granted the motion and ordered the Georgia Secretary of State to cancel the registration. The court found that the "plaintiffs did not have valid grounds to register the trademark at the time of filing," as required under Georgia law. App. (No. 19-1349),

7

Vol. 2 at 396. Mr. Underwood filed an interlocutory appeal from the district court's grant of partial summary judgment.

4. **Motion for Summary Judgment**

BofA moved for summary judgment on Mr. Underwood's infringement claims. The district court granted the motion. It found that Mr. Underwood had failed to demonstrate a protectable interest in his marks. On that basis, the district court dismissed Mr. Underwood's claims for (1) violation of Section 43(a) of the Lanham Act, (2) common law service mark infringement, and (3) common law unfair competition.[5]

The district court entered final judgment, and Mr. Underwood timely appealed. We consolidated the two appeals and now resolve both.

## II. DISCUSSION

We address (A) our appellate jurisdiction, (B) BofA's cancellation counterclaim, and (C) Mr. Underwood's infringement claims.

We review the district court's grant of summary judgment de novo, applying the same standard applied by the district court. *See Sandoval v. Unum Life Ins. Co. of Am.*, 952 F.3d 1233, 1236 (10th Cir. 2020). We view the evidence and draw all reasonable inferences in the light most favorable to Mr. Underwood. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Summary judgment is proper "if the movant shows that

---

[5] The district court did not expressly address BofA's remaining counterclaims. It also declined to exercise supplemental jurisdiction over Mr. Underwood's claims under Colorado and Georgia law, and it dismissed those claims without prejudice.

there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

## A. *Jurisdiction*

Before the district court entered final judgment, BofA moved to dismiss Mr. Underwood's interlocutory appeal, arguing we lack appellate jurisdiction. We need not address this issue because Mr. Underwood filed a second notice of appeal from the final judgment the district court entered after granting summary judgment on Mr. Underwood's infringement claims. The district court's summary judgment order and final judgment constituted a "final decision" appealable under 28 U.S.C. § 1291.[6]

Even if Mr. Underwood's interlocutory appeal was premature, the interlocutory "notice of appeal filed before the district court dispose[d] of all claims" became effective when Mr. Underwood obtained a "final adjudication before the court of appeals

---

[6] Ordinarily, a "grant of summary judgment [is] not an appealable final order [if] a counterclaim . . . remain[s] unadjudicated when the district court enter[s] summary judgment." *See Lewis v. B.F. Goodrich Co.*, 850 F.2d 641, 642 (10th Cir. 1988) (en banc). But here, BofA's five unadjudicated counterclaims do not deprive us of jurisdiction. In them, BofA sought declarations that it was not liable to Mr. Underwood for his claims against BofA. When the district court granted BofA's motion for summary judgment on Mr. Underwood's infringement claims, BofA's five unadjudicated counterclaims became moot. Adjudicating them would not have "settl[ed] . . . some dispute which affect[ed] the behavior of [Mr. Underwood] toward [BofA]." *See Rio Grande Silvery Minnow v. Bureau of Reclamation*, 601 F.3d 1096, 1110 (10th Cir. 2010) (quotations omitted). Thus, notwithstanding the unadjudicated counterclaims, the district court's order disposing of Mr. Underwood's infringement claims was a final appealable order under 28 U.S.C. § 1291 because it "end[ed] the litigation on the merits and le[ft] nothing for the court to do but execute the judgment." *Miami Tribe of Okla. v. United States*, 656 F.3d 1129, 1137 (10th Cir. 2011) (quoting *Coopers & Lybrand v. Livesay*, 437 U.S. 463, 467 (1978)).

9

consider[ed] the case on its merits." *Ruiz v. McDonnell*, 299 F.3d 1173, 1179 (10th Cir. 2002); *see also Cook v. Baca*, 625 F. App'x 348, 352 (10th Cir. 2015) (unpublished) ("Because final judgment has entered in these consolidated cases, [the appellant's] first notice of appeal has ripened.").[7]

Thus, we have jurisdiction over both of the district court's orders. We deny as moot BofA's motion to dismiss Mr. Underwood's first appeal.[8]

### B. *Cancellation Counterclaim*

The district court found that the Georgia registration for Mr. Underwood's E.R.I.C.A. mark should be cancelled because the registration was improperly granted under Georgia law. We agree.

---

[7] Although not precedential, we find the reasoning of unpublished decisions cited in this opinion instructive. *See* 10th Cir. R. 32.1 ("Unpublished decisions are not precedential, but may be cited for their persuasive value."); *see also* Fed. R. App. P. 32.1.

[8] We also deny BofA's request for attorney fees and costs in connection with moving to dismiss the interlocutory appeal. Although BofA points to out-of-circuit authority suggesting Mr. Underwood had no non-frivolous arguments that we had interlocutory jurisdiction, it is unsettled in this circuit whether a district court's order directing cancellation of a trademark registration is immediately appealable under 28 U.S.C. § 1292(a)(1). We cannot say that an award of fees and costs is appropriate under 28 U.S.C. § 1927 because Mr. Underwood's attorneys did not act "recklessly or with indifference to the law." *See Steinert v. Winn Grp., Inc.*, 440 F.3d 1214, 1221 (10th Cir. 2006) (quotations omitted). Similarly, an award is inappropriate under Federal Rule of Appellate Procedure 38 because Mr. Underwood's arguments on interlocutory appellate jurisdiction were not "wholly without merit." *Braley v. Campbell*, 832 F.2d 1504, 1510 (10th Cir. 1987) (en banc) (quotations omitted).

10

1. **Additional Legal Background**

"[W]hen interpreting Georgia trademark law, we look for guidance to general principles of American trademark law as reflected in persuasive federal precedents . . . and in trademark law treatises." *McHugh Fuller Law Grp., PLLC v. PruittHealth, Inc.*, 794 S.E.2d 150, 154 (Ga. 2016).

   a. *Georgia trademark applications*

An applicant for a Georgia trademark must provide "[a] description of the goods or services in connection with which the mark is used and the mode or manner in which the mark is used in connection with such goods or services," and "[t]he date when the trademark or service was first used anywhere," and in Georgia. Ga. Code Ann. § 10-1-442(a)(2)-(3). A service mark is "used" "when it is used to identify the services of one person and to distinguish them from the services of others and such services are sold or otherwise rendered in [Georgia]." *Id.* § 10-1-440(c). Unlike federal law, which allows for registration on the basis of intent to use a mark, *see* 15 U.S.C. § 1051(b); *VersaTop Support Sys., LLC v. Ga. Expo, Inc.*, 921 F.3d 1364, 1369 (Fed. Cir. 2019), Georgia law requires the registrant to use the mark before registration, *see* Ga. Code Ann. § 10-1-440(c); *id.* § 10-1-442(a)(2)-(3).

   b. *Cancellation*

A party seeking cancellation of a trademark registration "must prove two elements: (1) that it has standing; and (2) that there are valid grounds for canceling the registration." *Cunningham v. Laser Golf Corp.*, 222 F.3d 943, 945 (Fed. Cir. 2000). The standing element in the cancellation context is distinct from Article III standing and is not

11

jurisdictional. *See id.* Cancellation standing requires "that the party seeking cancellation believe that it is likely to be damaged by the registration." *Id.*

In Georgia, "[t]he Secretary of State shall cancel . . . [a]ny registration concerning which a court of competent jurisdiction shall find that [t]he registration was granted improperly." Ga. Code Ann. § 10-1-448(a)(3)(C). Thus, a valid ground for cancellation arises when a Georgia mark is registered and the registrant did not "use" the mark prior to registration within the meaning of Georgia law. *See Aycock v. Eng'g, Inc. v. Airflite, Inc.*, 560 F.3d 1350, 1357 (Fed. Cir. 2009) ("The registration of a mark that does not meet the use requirement is void ab initio.").

c. *Reforming a registration*

In some instances, reformation of a registration is appropriate rather than full cancellation. An "applicant's nonuse of its mark on some of the identified services" in the registration is distinct from an "applicant's complete failure to make use of its mark before filing the application on any of its identified services." *Grand Canyon W. Ranch v. Hualapai Tribe*, Opp. No. 91162008, 2006 WL 802407, at *2 (T.T.A.B. 2006). Although "the harsh remedy of voiding the application [i]s appropriate" for complete failure to use the mark before registration, "applicants that have used the mark in connection with some of the goods or services identified in their applications, but not others, may cure this problem by amending their applications to delete the offending goods and services." *See Kelly Servs., Inc. v. Creative Harbor, LLC*, 846 F.3d 857, 869 (6th Cir. 2017) (quotations omitted).

12

2. **Analysis**

Mr. Underwood's Georgia registration should be cancelled because the registration was "granted improperly" and there is no basis for reformation.

a. *Registration was "granted improperly"*

The registration for the E.R.I.C.A. mark was "granted improperly." *See* Ga. Code Ann. § 10-1-448(a)(3)(C).[9]

First, Mr. Underwood does not contest in his briefs that BofA has standing because "being sued for infringement is sufficient to support standing for a counterclaim for cancellation." *World Mkt. Ctr. Venture, LLC v. Tex. Int'l Prop. Assocs.*, No. 2:08-cv-01753-RCJ-GWF, 2009 WL 3303758, at *3 (D. Nev. Oct. 14, 2009). The continuing Georgia registration gave BofA "a reasonable belief that there is a likelihood of damage

---

[9] BofA pled its cancellation counterclaim under Ga. Code Ann. § 10-1-448(a)(3)(D), contending the registration was "fraudulently-obtained." App. (No. 19-1349), Vol. 1 at 28, 31, 48. Without amending the counterclaim, BofA moved for partial summary judgment under Ga. Code Ann. § 10-1-448(a)(3)(C), arguing the registration "was granted improperly." *See id.* at 78. In his response brief to the motion for summary judgment, Mr. Underwood acknowledged that "[t]he Defendant does not seek summary judgment under the fraud prong of the Georgia statute, but rather pursuant to section (C) pertaining to an improperly granted registration." App. (No. 19-1349), Vol. 2 at 153 (citation omitted). And the district court granted the motion on the ground that the registration was "granted improperly," not that it was "fraudulently obtained." *Id.* at 398. The district court thus properly decided the issue of cancellation on the "granted improperly" ground by consent of the parties under Federal Rule of Civil Procedure 15(b)(2). Rule 15(b)(2) provides: "When an issue not raised by the pleadings is tried by the parties' express or implied consent, it must be treated in all respect as if raised in the pleadings. . . . [F]ailure to amend does not affect the result of the trial of that issue." *See also Sinclair Wyo. Refin. Co. v. A&B Builders, Ltd.*, 989 F.3d 747, 777 n.18 (10th Cir. 2021) (noting that Rule 15(b) can apply to counterclaims at summary judgment).

13

caused by the continuing registration of the [E.R.I.C.A.] mark," *see* 3 McCarthy § 20:46, by jeopardizing the incontestability of BofA's registered federal service mark, *see* 15 U.S.C. § 1065 (describing the "incontestable" rights of a federal registration holder "except to the extent, if any, to which the use of a mark registered on the principal register infringes a valid right acquired under the law of any State . . .").

Second, BofA has valid grounds to seek cancellation of Mr. Underwood's Georgia registration. In opposing BofA's motion for partial summary judgment, Mr. Underwood "admit[ted] . . . that prior to 2015 [he] did not use the Georgia trademark in connection with a service that 'verbally tells the news and current events through cell phone and computer applications.'" App. (No. 19-1349), Vol. 2 at 151. His admission that he had not used the Georgia trademark with the services specified on the Georgia registration resolves the question whether the services were "used" before October 2010. *See* Ga. Code Ann. § 10-1-442(a)(2)-(3); *id.* § 10-1-440(c). Because Mr. Underwood did not satisfy the statutory use requirement for registration, the district court correctly ordered that it be cancelled.[10]

---

[10] Mr. Underwood is incorrect that cancellation "is reserved for a finding of fraud." *See* Aplt. Br. (No. 19-1349) at 9. In Georgia, cancellation because a "registration was obtained fraudulently," Ga. Code Ann. § 10-1-448(a)(3)(D), and cancellation because a "registration was granted improperly," *id.* § 10-1-448(a)(3)(C), are separate grounds.

b. *No basis for reformation of the registration*

Mr. Underwood argues that rather than cancelling the registration, the district court should have reformed the registration to reflect that he used the E.R.I.C.A. mark "in partial conformity with the registration." Aplt. Br. (No. 19-1349) at 6. We disagree.

Mr. Underwood cannot show any basis to reform his Georgia registration. The Georgia registration lists only a single service associated with the E.R.I.C.A. mark: "E.R.I.C.A. verbally tells the news and current events via cell phones and computer applications." App. (No. 19-1349), Vol. 1 at 141 (capitals omitted). Mr. Underwood's admission that he did not use the mark in connection with the only service listed on the registration before October 2010 means that he cannot show a necessary precondition for reformation—that he used the mark with "*some* of the goods or services identified in the[] application[], but not others." *Kelly Servs.*, 846 F.3d at 869 (emphasis added).

Mr. Underwood's suggestion that the district court could have reformed the registration to "a computer animated woman" lacks merit. Aplt. Br. (No. 19-1349) at 7. The "computer animated woman" language comes from the registration's description of the E.R.I.C.A. mark, not from the registration's list of services that the mark purported to identify or distinguish. *See* App. (No. 19-1349), Vol. 1 at 141. Under trademark law principles, "it is the trade, and not the mark, that is to be protected." *Hanover Star Milling Co. v. Metcalf*, 240 U.S. 403, 416 (1916), *superseded on other grounds by* 15 U.S.C. § 1072. Without a showing of the relevant services the mark identifies and distinguishes, the mark itself is not protectible. *See* 2 McCarthy § 16:1 ("The way to obtain rights in a business symbol is to actually *use* it as a mark.").

15

Finally, Mr. Underwood's argument that mitigating circumstances counsel against complete cancellation is unavailing. He urges that his statement of use in the Georgia application was harmless or unintentional rather than fraudulent. But because the basis for cancellation here is that the registration was "granted improperly," not that it was "obtained fraudulently," it is irrelevant that Mr. Underwood "did not purposely misstate his use," or that "the Georgia Secretary of State directly led [Mr.] Underwood to believe that his website-use and promotional-use were sufficient to file a use-based application." Aplt. Br. (No. 19-1349) at 11.

\* \* \* \*

We affirm the cancellation of Mr. Underwood's Georgia registration.

### C. *Infringement Claims*

The district court granted summary judgment to BofA on Mr. Underwood's claims that BofA infringed his E.R.I.C.A. and my24erica.com service marks. On appeal, Mr. Underwood argues he established a protectable interest in both marks through actual and analogous use. On the E.R.I.C.A. mark, we vacate summary judgment because the district court applied the wrong legal standard for actual use. We affirm summary judgment on the my24erica.com mark.

1. **Additional Legal Background**

    a. *Section 43(a)*

Section 43(a) of the Lanham Act prohibits anyone, "in connection with any goods or services, . . . [from] us[ing] in commerce any word, term, name, symbol, or device, or any combination thereof, . . . which is likely to cause confusion." 15 U.S.C.

16

§ 1125(a)(1)(A).[11]  To prevail under Section 43(a), a plaintiff must show "(1) that the plaintiff has a protectable interest in the mark; (2) that the defendant has used an identical or similar mark in commerce; and (3) that the defendant's use is likely to confuse customers."  *1-800 Contacts, Inc. v. Lens.com, Inc.*, 722 F.3d 1229, 1238 (10th Cir. 2013) (citation and quotations omitted).

This appeal addresses only the first element, whether Mr. Underwood has a protectable interest in the E.R.I.C.A. and my24erica.com marks.  When, as here, the plaintiff's marks are unregistered, the plaintiff has the "burden to demonstrate that [the mark] is protectable under § 43(a)."  *Donchez*, 392 F.3d at 1216.

b.  *Protectable interest*

A plaintiff acquires a protectable interest by "us[ing] a distinct mark in commerce."  *See B&B Hardware*, 576 U.S. at 142.  "[S]o long as a person is the first to use a particular mark," that person will prevail against subsequent users of the mark.  *See ITC Ltd. v. Punchgini, Inc.*, 482 F.3d 135, 147 (2d Cir. 2007).  Under the Lanham Act, the plaintiff must make "bona fide use of a mark in the ordinary course of trade, and not . . . merely to reserve a right in a mark."  15 U.S.C. § 1127.  A service mark is used in

---

[11] The opinion's discussion of the Lanham Act Section 43(a) claim is applicable to the other two claims on which the district court granted summary judgment:  common law service mark infringement and common law unfair competition.  *See Donchez v. Coors Brewing Co.*, 392 F.3d 1211, 1219 (10th Cir. 2004) (common law service mark infringement has similar elements as a claim under Section 43(a)); *Suntree Techs., Inc. v. Ecosense Int'l, Inc.*, 693 F.3d 1338, 1345 (11th Cir. 2012) (same for common law unfair competition); *see also* 1 McCarthy § 1:19.50 (noting that Section 43(a) "federalized" the common law of trademark infringement and unfair competition).

commerce "when it is used or displayed in the sale or advertising of services and the services are rendered in commerce." *Id.*

The plaintiff's "use of a mark in commerce . . . must be sufficient to establish *ownership rights* for a plaintiff to recover against subsequent users under section 43(a)." *Planetary Motion, Inc. v. Techsplosion, Inc.*, 261 F.3d 1188, 1195 (11th Cir. 2001). This requirement has its roots in the common law "rule of trademark ownership in the United States[,] priority of use." 2 McCarthy § 16:1.[12] Whether such prior use is sufficient to confer a protectable interest in the mark does not turn on whether the use was for profit, but instead on whether the activities "bear elements of competition, notwithstanding [a] lack of an immediate profit-motive." *Planetary Motion*, 261 F.3d at 1200; *see id.* at 1199 ("Common law unfair competition protection extends to non-profit organizations because they nonetheless engage in *competition* with other organizations.").

The parties agree that a plaintiff may show use sufficient to establish a protectable interest through (1) "actual use in the market," *Allard Enters., Inc. v. Advanced*

---

[12] As stated above, the first element of a § 43(a) claim requires a plaintiff to establish a protectable interest in a mark, while the second and third elements correspond to the defendant's infringing conduct. Both a plaintiff's protectable interest and a defendant's infringing conduct require use of a mark in commerce. In this appeal, we need only address the first element.

The "use of commerce" language in § 43(a) serves the further purpose of "reflect[ing] Congress's intent to legislate to the limits of its authority under the Commerce Clause, rather than to limit the Lanham Act to profit-seeking uses of a trademark." *United We Stand Am., Inc. v. United We Stand, Am. N.Y., Inc.*, 128 F.3d 86, 92-93 (2d Cir. 1997); *see* 15 U.S.C. § 1127 ("The word 'commerce' means all commerce which may lawfully be regulated by Congress."). The conduct in this case is regulable because both the plaintiff's marks and the defendant's mark are used on the internet, and "the Internet is generally an instrumentality of interstate commerce." *Id.*

*Programming Res., Inc.*, 146 F.3d 350, 354 (6th Cir. 1998) (quotations omitted); or (2) "prior use analogous to trademark or service mark use," *Herbko Int'l, Inc. v. Kappa Books, Inc.*, 308 F.3d 1156, 1162 (Fed. Cir. 2002). As to either, the plaintiff must show use of the mark as a service mark, which means use "to identify and distinguish the services of one person, including a unique service, from the services of others and to indicate the source of the services, even if that source is unknown." 15 U.S.C. § 1127.

> i. Actual use

Actual use of a mark consists of "attempt[s] to complete genuine commercial transactions." *Allard Enters.*, 146 F.3d at 359. A service mark is used in commerce when services are "rendered to others," that is, "[when] the service provider *in fact* benefits third parties, regardless of its reason for providing its services." *Morningside Grp. Ltd. v. Morningside Cap. Grp., LLC*, 182 F.3d 133, 138 (2d Cir. 1999) (quotations omitted). To establish actual use, "[t]he extent or duration of use is of no particular significance other than to the extent that it demonstrates [an] intention to adopt." *Drexel Enters., Inc. v. Richardson*, 312 F.2d 525, 527 (10th Cir. 1962). Even "a single use in trade may sustain trademarks rights if followed by continuous commercial utilization." *Blue Bell, Inc. v. Farah Mfg. Co.*, 508 F.2d 1260, 1265 (5th Cir. 1975). The use must be part of a bona fide transaction, and not, for example, use indicating "the *mere* intent to reserve a mark for later use." *Allard Enters.*, 146 F.3d at 359 (emphasis added).

Although "a website that bears a trademark may constitute a bona fide use in commerce," the website must "identify [the] goods or services [the owner] could have provided through or in connection with the website." *Specht v. Google Inc.*, 747 F.3d

19

929, 934 (7th Cir. 2014); *see also Schreiber v. Dunabin*, 938 F. Supp. 2d 587, 598 (E.D. Va. 2013) (noting that merely "operating a website available on the Internet is not equivalent to use in United States commerce").  "The important question is not how readily a mark will be noticed but whether, when noticed, it will be understood as identifying and indicating the origin of the services."  TMEP § 1301.02 (8th ed. Oct. 2018).

ii.  Analogous use

In contrast to actual use, which is use of the mark in a genuine transaction involving the provision of goods or services, analogous use is use in commerce that is non-transactional.  It typically consists of "promotional efforts" for the goods or services at issue, *FN Herstal SA v. Clyde Armory Inc.*, 838 F.3d 1071, 1081 (11th Cir. 2016), such as "advertising brochures, catalogs, newspaper ads, and articles in newspapers and trade publications," *T.A.B. Sys. v. Pactrel Teletrac*, 77 F.3d 1372, 1375 (Fed. Cir. 1996).  No genuine transaction is required to acquire a protectable interest in the mark.

Although actual use need not have a "substantial impact on the purchasing public," analogous use must be "of such a nature and extent as to create public identification of the target term with the [user's] product or service."  *See T.A.B. Sys.*, 77 F.3d at 1375-76.  "[A]nalogous use must be use that is open and notorious," that is, "of such a nature and extent that the mark has become popularized in the public mind so that the relevant segment of the public identifies the marked goods with the mark's adopter." *Am. Express v. Goetz*, 515 F.3d 156, 161-62 (2d Cir. 2008) (quotations omitted).

20

2. **Analysis**

Mr. Underwood argues that before BofA's October 2016 priority date, he established protectable interests through both actual use and analogous use of the E.R.I.C.A. mark and the my24erica.com mark. On the E.R.I.C.A. mark, we find the district court (1) addressed actual use but did so under an incorrect legal standard, and (2) correctly found there was insufficient analogous use of the E.R.I.C.A. mark. On the my24erica.com mark, we find it was not actually or analogously used as a service mark.

    a. *E.R.I.C.A. mark*

        i.  <u>Actual use</u>

Mr. Underwood argues he can show actual use of the E.R.I.C.A. mark because, "by March 2015, [he] was using the E.R.I.C.A. . . . mark[] on his My24erica.com website . . . to provide actual search-engine and personal-assistant services to the public." Aplt. Br. at 31; *see id.* at 5 ("The record demonstrates that Mr. Underwood used the E.R.I.C.A. mark in conjunction with *actual* services provided to the general public no later than March 2015 . . . ."). The district court passed upon this issue but applied the wrong legal standard. We therefore vacate the summary judgment in favor of BofA on Mr. Underwood's infringement claims concerning the E.R.I.C.A. mark and remand for the district court to apply the correct actual use standard.

        1)  District court passed on actual use

BofA asserts that Mr. Underwood failed to present an actual use argument to the district court. *See* Aplee. Br. at 15. Even so, we may consider actual use on appeal if the "district court explicitly consider[ed] and resolve[d] [the] issue of law on the merits."

*Tesone v. Empire Mktg. Strategies*, 942 F.3d 979, 991 (10th Cir. 2019). Courts may review a question "not pressed so long as it has been passed upon." *Lebron v. Nat'l R.R. Passenger Corp.*, 513 U.S. 374, 379 (1995) (quotations omitted).

A district court "passes upon an issue when it applies the relevant law to the relevant facts." *Tesone*, 942 F.3d at 992 (quotations omitted). The district court's order addressed actual use by considering and rejecting it as a basis for Mr. Underwood's protectable interest in the E.R.I.C.A. mark.[13] Because the district court "recognized that the [actual use] theory [Mr. Underwood] presents on appeal was at play in the litigation and rejected it," the issue is properly before us. *See Mid Atl. Cap. Corp. v. Bien*, 956 F.3d 1182, 1195 n.6 (10th Cir. 2020).

The district court identified two ways to meet the Lanham Act's protectable-interest requirement: (1) when "actual sales have occurred," or (2) through "analogous use." App., Vol. 6 at 1450. In its explanation of the background legal principles, the court's discussion of analogous use dwarfed its brief mention of "actual sales." And if the court had not discussed actual sales further, we might conclude it had not passed upon the issue of actual use.

---

[13] Mr. Underwood did not waive through inadequate appellate briefing the argument that the district court passed upon the issue of actual use. Responding to BofA's response brief argument that he forfeited the actual use issue in district court, Mr. Underwood cited "authority" and provided "analysis" to argue that the district court passed upon the issue of actual use. *See Burke v. Regalado*, 935 F.3d 960, 1018 n.44 (10th Cir. 2019). Nor did he waive this argument by presenting it for the first time in the reply brief. We will consider such an argument when, as here, the "new issue argued in the reply brief is offered in response to an argument raised in the appellee's brief." *Beaudry v. Corr. Corp. of Am.*, 331 F.3d 1164, 1166 n.3 (10th Cir. 2003).

But the district court addressed whether Mr. Underwood had a protectable interest in the E.R.I.C.A. mark in two sections that were clearly set off with "[f]irst" and "[s]econd" identifiers. *See id.* at 1450-51. In the first section on actual use, the court found that "it [wa]s undisputed that no customers purchased goods or services offered under the mark," and that the Plaintiffs had not "generated any revenue from their use of the mark." *Id.* at 1450. It also found that the Plaintiffs had never used the mark in connection with the services described in the Georgia registration. *Id.* at 1450-51. The court therefore rejected that Mr. Underwood had established a protectable interest in the E.R.I.C.A. mark through actual sales and use of the mark.[14] In the second section on analogous use, the court explained that "Plaintiffs have not presented evidence of any promotional activities, including hosting of the website, demonstrating that a substantial share of the consuming public was reached or came to identify the E.R.I.C.A. mark with their services." *Id.* at 1451. It therefore rejected Mr. Underwood's reliance on analogous use.

The district court's actual use analysis applied what it believed to be "relevant law to the relevant facts." *Tesone*, 942 F.3d at 992 (quotations omitted). The court identified as "relevant law" that actual use sufficient to establish a protectable interest arises when

---

[14] In the introductory part of the order, the district court stated, "In determining that Plaintiffs had failed to satisfy the prerequisites for Georgia registration, the Court did not reach the issue of whether Plaintiffs had presented sufficient evidence of 'analogous use' that would establish priority over Defendant's use of its mark. On that basis, Defendant now moves for summary judgment and dismissal of the entire case." App., Vol. 6 at 1449 (citation omitted). This passage does not alter that the court also addressed the issue of actual use.

"customers purchase[] goods or services offered under the mark," or when the user "generates any revenue from their use of the mark." App., Vol. 6 at 1450. It identified the "relevant facts" as follows: (1) "it is undisputed that no customers purchased goods or services offered under the mark"; (2) "nor have Plaintiffs generated any revenue from their use of the mark"; and (3) "Plaintiffs have not shown that they ever used their mark with any service . . . as described in the Georgia registration." *Id.* at 1450-51. The court did not simply address actual use in passing, but instead "develop[ed] additional facts" concerning whether Mr. Underwood could establish a protectable interest through actual use by reference to sales, revenue, and use of the mark in connection with services. *See United States v. Criollo-Casteneda*, 89 F. App'x 173, 175 (10th Cir. 2004) (unpublished).[15]

Although the district court's analysis of actual use lacked case citations, the court "resolve[d] an issue of law on the merits." *See United States v. Hernandez-Rodriguez*, 352 F.3d 1325, 1328 (10th Cir. 2003).[16] The court's reasoning, though brief,

---

[15] As explained below, the district court made two legal errors in its actual use analysis. A district court need not decide an issue correctly to have passed upon the issue. The "passed upon" argument usually arises when an appellant seeks reversal on an issue that the appellee argues was forfeited in district court. *See Tesone*, 942 F.3d at 991-93.

[16] In fact, the entire order had few citations. The district court cited only two district court opinions for the analogous use standard, *see* App., Vol. 6 at 1450, and its analogous use analysis cited only an additional district court and Ninth Circuit opinion, *see id.* at 1451-52. Also, until today, we have discussed the actual use standard in any depth only once, in *Drexel Enterprises, Inc. v. Richardson*, 31 F.2d 525, 526-27 (10th Cir. 1962). Thus, in context, the order's lack of citations to actual use authorities does

24

"evaluate[d] th[e] legal issue" of actual use to the extent it believed was required to give a "comprehensive resolution." *See Criollo-Casteneda*, 89 F. App'x at 175.

2) Legal error and remand

The district court applied the wrong legal standard to the issue of actual use of the E.R.I.C.A. mark. We therefore remand for the court to apply the correct standard.

"When the court of appeals notices a legal error, it is not ordinarily entitled to weigh the facts itself and reach a new conclusion; instead, it must remand to the district court for it to make a new determination under the correct law." *United States v. Hasan*, 609 F.3d 1121, 1129 (10th Cir. 2010). When the district court has taken "an erroneous view of the law, a remand is the proper course unless the record permits only one resolution of the factual issue." *Pullman-Standard v. Swint*, 456 U.S. 273, 292 (1982).

Here, the district court committed two legal errors. First, it assumed that customers must have "purchased" the services offered or that Mr. Underwood must have generated revenue to qualify as actual use. App., Vol. 6 at 1450-51. But a service mark is used when "the service provider *in fact* benefits third parties, regardless of its reason for providing its services." *Morningside Grp.*, 182 F.3d at 138. Second, the court erred by limiting the services at issue to those listed in the Georgia registration. It should have considered the search engine and personal assistant services that Mr. Underwood claims my24erica.com offered and that form the basis of Mr. Underwood's Section 43(a) claim.

---

not mean the court failed to apply "relevant law" to the "relevant facts." *See Tesone*, 942 F.3d at 992.

*See, e.g.* App., Vol. 1 at 18 (describing my24erica.com in the complaint as, among other things, "an interactive global search engine platform").

Under the correct view of the law, to establish a protectable interest in the E.R.I.C.A. mark based on actual use, Mr. Underwood must establish (1) my24erica.com—the only place where Mr. Underwood claims services were offered in connection with the mark—was publicly accessible before BofA's priority date of October 2016; (2) search engine and personal assistant services on my24erica.com were "rendered to others" before October 2016, *Morningside Grp.*, 182 F.3d at 138 (quotations omitted); and (3) as it appeared on the my24erica.com website display, the E.R.I.C.A. mark "clearly identif[ied] and distinguish[ed]" the services offered "on the website," 2 McCarthy § 16:32.70.

We decline to address these factual issues under the correct actual use legal standard in the first instance. Instead, we remand "out of an abundance of caution and in the interest of justice, because we have difficulty concluding that the record leads ineluctably to only one result" on the issue of actual use. *See In re Woods*, 743 F.3d 689, 707 (10th Cir. 2014).[17]

ii. Analogous use

Our remand is limited to the actual use issue because the district court did not err in concluding that Mr. Underwood could not show analogous use of the E.R.I.C.A. mark.

---

[17] As explained above, BofA's counterclaims became moot in light of the district court's disposition of Mr. Underwood's infringement claims. On remand, the district court should address BofA's counterclaims.

Thus, on remand, Mr. Underwood may not pursue his analogous use theory for the E.R.I.C.A. mark.

For a finding of analogous use of the E.R.I.C.A. mark before October 2016, Mr. Underwood relies on evidence of (1) use at business meetings, (2) distribution of around 1,500 business cards to undisclosed people, (3) distribution of around 200 promotional DVDs to undisclosed people, and (4) use at a meeting with AT&T in preparation for the failed joint venture. He also cites the my24erica.com website itself and the 772 Facebook likes purportedly associated with the my24erica.com website. No reasonable jury could find analogous use from this evidence.

First, there is no evidence that any of the promotional activities in the years 2009 to 2012—the use of the mark in a PowerPoint presentation at business meetings, on business cards, on promotional DVDs, and with AT&T—were known outside of a small handful of industry actors. Such behind-the-scenes activities are insufficient to show that the mark was "popularized in the public mind." *See Goetz*, 515 F.3d at 162 (quotations omitted) (using a slogan "only in communications with a few commercial actors within the credit card industry" was insufficient to demonstrate an association in the public mind). When "the use of . . . marks in the provision of services [i]s limited to a handful of presentations [and] seminars," that is the "sort of minimal activity [that] is insufficient to satisfy the 'use' element of the test." *Int'l Healthcare Exch. v. Glob. Healthcare Exch., LLC*, 470 F. Supp. 2d 365, 371 (S.D.N.Y. 2007). Based on the lack of evidence that members of the general public received the business cards or the DVDs, these

27

promotional activities do not demonstrate a "substantial impact on the purchasing public." *See FN Herstal*, 838 F.3d at 1081 (quotations omitted).

Second, the evidence concerning my24erica.com itself—the fact of its existence and the Facebook likes—is insufficient to demonstrate widespread association in the public mind between the Plaintiffs' search engine services and the E.R.I.C.A. mark. Even assuming that the 772 likes on the My24HourNews.Com Facebook page as of October 2018 indicate that 772 people visited my24erica.com at some point and used its services, that evidence would not create a fact question about analogous use.

Mr. Underwood needed to establish protectability as of October 2016. But the record does not show how many people visited my24erica.com before October 2016. Even if we credited all 772 likes to the period before October 2016, the website usage is insufficient to show that a significant segment of the public associated the E.R.I.C.A. mark with the search engine services. In *T.A.B. Systems*, the Federal Circuit found that "purchaser perception must involve more than an insubstantial number of potential customers. For example, if the potential market for a given service were 10,000 persons, then advertising shown to have reached only 20 to 30 people as a matter of law could not suffice." *T.A.B. Sys.*, 77 F.3d at 1377.

*T.A.B. Systems* shows the weakness of Mr. Underwood's analogous use argument because there is a wide gap between the "potential market" for his internet services and the actual number of users. Though he claims to have offered services globally over the internet, Mr. Underwood can point to evidence of no more than 772 users total before October 2016. *See Westrex Corp. v. New Sensor Corp.*, Opp. Nos. 91168152 &

28

91170940, 2007 WL 1676790, at *5 (T.T.A.B. 2007) (finding no analogous use when despite efforts to publicize the business, there was little, if any, response). The low number of users relative to the "potential market" demonstrates that no more than "an insubstantial number of potential customers" were aware of my24erica.com, let alone that they were aware of the services offered on the website and associated the E.R.I.C.A. mark with those services.

Thus, Mr. Underwood's analogous use theory lacks merit.

b.  *my24erica.com mark*

Mr. Underwood has failed to establish a protectable interest in the my24erica.com mark.[18]  To qualify as a service mark that has been used in commerce, whether under an actual or analogous use theory, the mark must "identify and distinguish the services of one person . . . from the services of others."  15 U.S.C. § 1127.  Because there is no dispute of fact that my24erica.com did not perform this function, it is not protectable.

In certain situations, a domain name may be protectable under the Lanham Act. *See U.S. Pat. & Trademark Off. v. Booking.com B. V.*, 140 S. Ct. 2298, 2308 (2020).  But

---

[18] The district court did not separately address whether the my24erica.com mark is protectable, even though Mr. Underwood's complaint, App., Vol. 1 at 19, and opposition to summary judgment, App., Vol. 2 at 428, asserted that his infringement claims were based on his ownership of the E.R.I.C.A. and my24erica.com marks.  The parties have fully briefed the issue of the protectability of the my24erica.com mark on appeal, the record is fully developed, our review is de novo, and the outcome is clear.  We therefore exercise our discretion to address the issue rather than remand.  *See Anixter v. Home-Stake Prod. Co.*, 77 F.3d 1215, 1229 (10th Cir. 1996) (reaching an issue not reached by the district court when it was properly before the district court, fully briefed on appeal, and no further fact-finding was necessary).

29

the "mere registration of a domain name [i]s not sufficient." *Brookfield Comm'cns v. W. Coast Ent'mt Corp.*, 174 F.3d 1036, 1052 (9th Cir. 1999). Like all marks, a domain name must be "used to identify and distinguish the source of goods or services" to be protectable. 1 McCarthy § 7:17.50. "Out of the millions of domain names, probably only a small percentage also play the role of a trademark or service mark." *Id.* A domain name is protectable if the domain itself has an "association with [the services] in the mind of the public based on the evidence of the length and nature of the use of the [domain name] mark." *St. Luke's Cataract & Laser Inst. v. Sanderson*, 573 F.3d 1186, 1209 (11th Cir. 2009).

The baseline association the public has with a domain name is to use it to "identif[y] an address on the Internet," *Booking.com*, 140 S. Ct. at 2303 n.1, "an identifier somewhat analogous to a telephone number," *Brookfield Comm'cns*, 174 F.3d at 1044; 1 McCarthy § 7:17.50 ("Like a street address or telephone number, every domain name serves the purely technological function of locating a web site in cyberspace."). It is thus normally difficult for a plaintiff to show that, beyond serving this logistical location-identifying function, the domain name is also "used to identify and to distinguish goods or services." *See Brookfield Comm'cns*, 174 F.3d at 1051.

Mr. Underwood cannot show that my24erica.com is one of the "small percentage" of domain names that qualify as service marks. There is no evidence Mr. Underwood deployed the designation my24erica.com for anything more than "as an address by means of which one may reach [his] Internet website." *In re Vicki Roberts*, Serial No. 76649075, 2008 WL 1944634, at *4 (T.T.A.B. 2008). For example, there is no evidence

30

that my24erica.com, as opposed to the E.R.I.C.A. mark, had a prominent place on the website, or that anything in the display "focused the web-user's attention on that name." *See St. Luke's*, 573 F.3d at 1207. Nor did the my24erica.com domain name appear on any advertisements or other promotional materials, in contrast to the My24HourNews.Com name. *See id.*

The my24erica.com mark is thus not entitled to protection.

### III. **CONCLUSION**

On BofA's cancellation counterclaim, we affirm summary judgment against Mr. Underwood. On Mr. Underwood's infringement claims, (1) we vacate summary judgment for BofA on the E.R.I.C.A. mark and remand for the district court to apply the correct actual use standard, and (2) we affirm summary judgment for BofA on the my24erica.com mark. Proceedings on remand shall be consistent with this opinion.

31