**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**April 18, 2024**

**Christopher M. Wolpert**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

ERIK M. UNDERWOOD, a Colorado
citizen; MY24HOURNEWS.COM, INC.,
a Colorado corporation,

    Plaintiffs - Appellants,

v.

BANK OF AMERICA CORPORATION,
a Delaware corporation,

    Defendant - Appellee.

No. 22-1402
(D.C. No. 1:18-CV-02329-RM-MEH)
(D. Colo.)

_____

**ORDER AND JUDGMENT**[*]
_____

Before **BACHARACH**, **McHUGH**, and **MORITZ**, Circuit Judges.
_____

Erik Underwood and My24HourNews.com, Inc. (collectively, plaintiffs) appeal the district court's order granting summary judgment to defendant Bank of America (BofA) on their trademark-infringement claim for the service mark "E.R.I.C.A." Because plaintiffs fail to establish any triable issue of fact about whether the service mark clearly distinguished the services offered, they cannot show a protectable interest in their unregistered mark, and we affirm.

---

[*] This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. But it may be cited for its persuasive value. *See* Fed. R. App. P. 32.1(a); 10th Cir. R. 32.1(A).

**Background**

In October 2010, Underwood obtained a Georgia state trademark registration

for the mark "E.R.I.C.A." Plaintiffs later launched the website www.my24erica.com,

which allows users to search for movies and actors in its online database.[1]

In October 2016, BofA filed an intent-to-use application for the mark

"ERICA" with the United States Patent and Trademark Office (USPTO). After the

USPTO approved the application, BofA launched ERICA as a virtual financial

assistant in its mobile banking application, and the USPTO formally issued the

ERICA registration to BofA in July 2018.

Plaintiffs then filed this action, asserting as relevant here that BofA was

infringing on their trademark. The district court granted BofA's motion to cancel

plaintiffs' Georgia trademark registration and its motion for summary judgment.

Plaintiffs appealed, and we affirmed the trademark cancellation and much of

the summary-judgment order, but we vacated and remanded on a single issue—

whether plaintiffs had established protectable trademark rights through a theory of

actual use of the E.R.I.C.A. mark in commerce. *See Underwood v. Bank of Am.*

*Corp.*, 996 F.3d 1038, 1059 (10th Cir. 2021). Setting out the correct legal framework

for assessing "actual use," we remanded for the district court to determine whether

plaintiffs could establish that: (1) www.my24erica.com was publicly accessible

---

[1] The parties dispute the date on which this website became publicly
accessible: plaintiffs assert it was in March 2015; BofA contends it was not until June
2018. As we later explain, this dispute is not material to our decision; for purposes of
this appeal, we accept plaintiffs' alleged date of publication.

before October 2016; (2) search-engine and personal-assistant services on the website "were 'rendered to others' before October 2016"; and (3) "the E.R.I.C.A. mark 'clearly identif[ied] and distinguish[ed]' the services offered 'on the website.'" *Id.* at 1057 (alterations in original) (first quoting *Morningside Grp. Ltd. v. Morningside Cap. Grp., L.L.C.*, 182 F.3d 133, 138 (2d Cir. 1999), and then quoting 2 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 16:32.70 (5th ed. Mar. 2021 update)).

On remand, the district court again granted summary judgment for BofA, finding that (1) even assuming the website was publicly accessible before October 2016, plaintiffs failed to create a genuine issue of material fact as to (2) whether plaintiffs rendered search-engine and personal-assistant services to others and (3) whether the mark clearly identified and distinguished the services offered by www.my24erica.com. It later denied plaintiffs' motion for reconsideration.

Plaintiffs appeal.

## Analysis

Plaintiffs challenge summary judgment for BofA on their trademark-infringement claim. We review a summary-judgment order de novo and apply the same legal standard as the district court. *GeoMetWatch Corp. v. Behunin*, 38 F.4th 1183, 1200 (10th Cir. 2022). Summary judgment is proper when there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law," Fed. R. Civ. P. 56(a), meaning that a reasonable jury could not return a verdict for the nonmoving party, *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248

3

(1986). On summary judgment, we view all facts and inferences in the light most favorable to the nonmoving party. *GeoMetWatch*, 38 F.4th at 1200.

As we explained in our prior decision in this case, "[t]he principle underlying trademark protection is that distinctive marks—words, names, symbols, and the like—can help distinguish a particular artisan's goods from those of others." *Underwood*, 996 F.3d at 1045 (quoting *B&B Hardware, Inc. v. Hargis Indus., Inc.*, 575 U.S. 138, 142 (2015)). And the overarching "rule of trademark ownership in the United States is priority of use," established by using a symbol or word to identify and distinguish the source of goods of services. *Id.* (quoting 2 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 16:1 (5th ed. Mar. 2021 update)). To establish a claim for trademark infringement under federal law, "a plaintiff must show '(1) that the plaintiff has a protectable interest in the mark; (2) that the defendant has used an identical or similar mark in commerce; and (3) that the defendant's use is likely to confuse customers.'" *Id.* (quoting *1-800 Contacts, Inc. v. Lens.com, Inc.*, 722 F.3d 1229, 1238 (10th Cir. 2013). For purposes of this appeal, we assume that the last two elements are established. So at issue here, as in the prior appeal, is only the first element: a protectable interest. *See id.* at 1052–53.

A plaintiff can establish a protectable interest in an unregistered service mark through "actual use in the market." *Id.* at 1053 (quoting *Allard Enters., Inc. v. Advanced Programming Res., Inc.*, 146 F.3d 350, 354 (6th Cir. 1998)). To do so, a "plaintiff must show use of the mark as a service mark, which means use 'to identify and distinguish the services of one person . . . from the services of others and to

4

indicate the source of the services, even if that source is unknown.'" *Id.* (quoting 15 U.S.C. § 1127). And actual use must take place in commerce, meaning that it consists of "attempt[s] to complete genuine commercial transactions," as opposed to uses merely intended "to reserve a mark for later use." *Id.* at 1053–54 (alteration in original) (quoting *Allard Enters.*, 146 F.3d at 359). As particularly relevant here, use of a mark on a website "may constitute a bona fide use in commerce," but "the website must 'identify [the] goods or services . . . provided through or in connection with the website.'" *Id.* at 1054 (alteration in original) (quoting *Specht v. Google, Inc.*, 747 F.3d 929, 934 (7th Cir. 2014)).

Here, as to actual use in commerce, recall that the district court assumed plaintiffs' website was publicly accessible before October 2016 but concluded both that plaintiffs did not render search-engine and personal-assistant services to others and that plaintiffs' use of the mark did not clearly identify and distinguish the services they provided. We will similarly assume public accessibility and will go one step further and assume that plaintiffs did render services to others.

Turning our focus to whether plaintiffs' use of the mark clearly identified and distinguished their services, we first note that the district court's analysis on this point lacked detail. It simply stated that plaintiffs' use did not meet this standard and offered as an "example" that "[p]laintiffs point[ed] to no evidence that any individuals who visited its website during that timeframe associated the mark with the website's services." App. vol. 7, 1658.

Taking off from this example, plaintiffs argue on appeal that the district court

5

"erred by *requiring* proof that a particular individual subjectively associated the ERICA mark with the website's services."[2] Aplt. Br. 19 (emphasis added). But as defendant identifies, the phrase "for example" indicates that the district court did not *require* such subjective proof; rather, it merely noted the absence of such proof when concluding that the use of the mark on the website did not clearly identify and distinguish the services provided. And it is not clear that doing so was erroneous: even plaintiffs acknowledge that this inquiry turns on the totality of the circumstances and thus could include the possibility of subjective proof. *See Planetary Motion, Inc. v. Techsplosion, Inc.*, 261 F.3d 1188, 1195–96 (11th Cir. 2001) (explaining that courts look at totality of circumstances to determine use in commerce, including "evidence that members of the targeted public actually associated the mark . . . with the [good or service] to which it was affixed"). In any event, we need not definitively resolve whether the district court erred by discussing the lack of subjective evidence in this case. We must simply assess, on de novo review, whether plaintiffs can show a genuine issue of material fact on actual use in commerce based on the totality of the circumstances.

---

[2] Plaintiffs also argue that the district court erred by providing inadequate notice of the basis for its ruling. But our prior decision included significant detail about the three issues to be decided on remand, and the district court ordered the parties to file supplemental briefing addressing those issues. Then, the district court issued its summary-judgment ruling based on those three issues. So we reject plaintiffs' notice argument. *Cf. Oldham v. O.K. Farms, Inc.*, 871 F.3d 1147, 1150–51 (10th Cir. 2017) (finding plaintiff was prejudiced by district court's grant of summary judgment on ground not raised or addressed by either party and instead raised sua sponte by court during hearing).

Seeking to do so, plaintiffs point to the About ERICA and Terms of Service sections of the website, which both mention either "E.R.I.C.A." or "ERICA." As an initial matter, to reach either of these webpages, a website visitor must scroll to the bottom of the information-heavy homepage and locate and click on a link in small-point, all-lowercase font in the bottom right corner.[3] Such an obscure use of the mark is unlikely to "'clearly identif[y] and distinguish' the services offered 'on the website.'" *Underwood*, 996 F.3d at 1057 (quoting 2 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 16:32.70 (5th ed. Mar. 2021 update)); *see also In re Osterberg*, 83 U.S.P.Q.2d 1220, at *3 (T.T.A.B. 2007) (finding no connection between use of mark and goods where "viewers of the webpage will have to search through the descriptive text even to find the purported mark"); *In re Azteca Systems, Inc.*, 102 U.S.P.Q.2d 1955, at *1–3 (T.T.A.B. 2012) (finding no connection between use of mark and goods where "the mark [wa]s distant from the description of the software, . . . separated from the description by more than fifteen lines of text concerning marginally[ ]related topics," and located "in the lower[,] left-hand, bottom corner of the first webpage").

Moreover, even if a website visitor manages to reach these linked webpages, these pages still do not establish "E.R.I.C.A." as a protectable service mark. The use of a service mark must allow for a "direct association" between the mark and the services offered. *In re Vicki Roberts*, 87 U.S.P.Q.2d 1474, at *3 (T.T.A.B. 2008)

---

[3] For reference, we attach an image of the homepage as an appendix to this Order and Judgment. *See* App. vol. 6, 1443–45.

(quoting *In re N.V. Organon*, 79 U.S.P.Q2d 1639, 1649 (T.T.A.B. 2006)). And it is not "enough that the mark and a reference to the services both appear in the same" location. *In re Osmotica Holdings Corp.*, 95 U.S.P.Q.2d 1666, at *3 (T.T.A.B. 2010).

Here, the webpages at issue do not allow for a direct association between the mark and the services offered. The About ERICA webpage states that "[t]he acronym E.R.I.C.A[.] stands for Electronic Repetitious Informational Clone Application" and describes "ERICA" as "an artificial intelligence mobile search engine that infuses software and holographic digital technology seamlessly together[,] to create an environment where your digital device is alive and interactive with the consciousness of E.R.I.C.A.," as well as "the first artificial intelligence to have a personality and a real image." App. vol. 1, 238. The Terms of Service webpage, under the heading "Description of Website Services Offered," states that "ERICA" is "a talking . . . [a]rtificial [i]ntelligence[] interactive search engine." *Id.* at 221. These summaries merely describe a technology and do not directly connect to the search services provided in a traditional search box on the homepage of www.my24erica.com. For one thing, the alleged service mark itself has two, indiscriminately used iterations: "E.R.I.C.A." and "ERICA." And perhaps more importantly, the alleged service described on these webpages is aspirational, not definitive. The "About ERICA" page specifically states that the application is "[c]urrently . . . in further development to implement the full vision on mobile and search engines to verbally tell you information and deliver entertainment news, restaurant reviews, financial updates, and so much more." *Id.* at 238. These descriptions do not indicate the *source* of any

offered search-engine or personal-assistant services; they simply describe the idea behind an application still "in development." *Id.*

Plaintiffs further argue that the use of the service mark on the website established its use in commerce because at the top of the homepage, there is a line of text just below a search bar that reads "ERICA'S CURRENT MOVIE PICKS"; plaintiffs say this "demonstrat[es] [E.R.I.C.A.'s] ability to provide the customer with recommendations." App. vol. 7, 1557. But this phrase does not clearly identify or distinguish search-engine or personal-assistant services. Indeed, the word "ERICA" in this title appears in the same font, size, and style as the other descriptive terms. *See* 1 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 3:4 (5th ed. Mar. 2024 update) ("Some of the common markers of whether a word, phrase[,] or picture is being used as a trademark are: larger-sized print, all capital letters or initial capitals, distinctive or different print style, color, and prominent position on label or in advertising."); *see also In re Post Properties, Inc.*, 227 U.S.P.Q. 334, at *2 (T.T.A.B. 1985) (finding "use in the manner of a service mark" in part because mark was "set off distinctively from the text of the ad copy in an extremely large typeface" and was "not an ordinary informational statement"); *Jaymo's Sauces LLC v. Wendy's Co.*, No. 19-cv-01026, 2021 WL 4712685, at *7 (C.D. Ill. Oct. 8, 2021) (unpublished) ("[T]he nonprivileged placement and emphasis on other terms coupled with the comparatively small, plain font of the term fail to adequately demonstrate it is being used as a source indicator on the bottle labels."). If anything, the phrase "ERICA'S CURRENT MOVIE PICKS", in matching text, implies that a person

9

named Erica is curating suggestions and not that the mark clearly identifies the source of any services. *See* 2 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 13:2 (5th ed. Mar. 2024 update) (personal names are subject to trademark protection only if their use "acquire[s] distinctiveness and secondary meaning").

In a final attempt to demonstrate actual use in commerce, plaintiffs highlight evidence showing, in their view, that visitors to the website associated the E.R.I.C.A. mark with the services being offered. In support, plaintiffs discuss references to "an E.R.I.C.A. search engine" in an affidavit from Kim Opler, Underwood's former roommate, App. vol. 5, 1211, and to "E.R.I.C.A. search results" in testimony from Todd Olson, Underwood's business colleague, App. vol. 3, 509. But neither of these statements mention the placement of the word "ERICA" on the website, nor do they suggest "that any such placement clearly identified and distinguished the services offered on the website." Aplee. Br. 33. And what matters here is whether the mark was actually used in commerce, meaning that it "identif[ied] [the] goods or services . . . provided through or in connection with the website." *Underwood*, 996 F.3d at 1054 (quoting *Specht*, 747 F.3d at 934). Without testimony about the placement of the mark, we cannot determine if Opler and Olson naturally associated the mark with the services or if they relied on prior knowledge.

In sum, we agree with the district court that plaintiffs presented no evidence that the E.R.I.C.A. mark, as used on the website, clearly distinguishes the source of the services offered by www.my24erica.com. Plaintiffs therefore fail to show actual

use in commerce of their mark, meaning that they cannot establish a protectable

interest in their mark as required for their trademark-infringement claim.[4]

### Conclusion

We affirm summary judgment for BofA on plaintiffs' trademark-infringement

claim because plaintiffs cannot establish actual use of their mark prior to BofA's

priority date of October 2016.

Entered for the Court

Nancy L. Moritz
Circuit Judge

---

[4] Because we conclude that the district court correctly awarded summary judgment to BofA, we need not separately address plaintiffs' argument that the district court later erred in denying their motion for reconsideration.

11

**Appendix**



18-CV-02329-PAB-MEH





*See* App. vol. 6, 1443–45.